Richard J. ROE, Sr., Plaintiff in error,

v.

STATE of Wisconsin, Defendant in error.†

Supreme Court

*No. 77–428–CR. Argued January 9, 1980.—Decided April 1, 1980.*
(Also reported in 290 N.W.2d 291.)

† Motion for reconsideration denied, without costs, on May 13, 1980.

For the plaintiff in error the cause was argued by *Robert J. Paul,* deputy state public defender, with whom on briefs was *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Edward S. Marion,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J.    Richard J. Roe, Sr. (defendant) was found guilty after a bifurcated jury trial,[1] of the first-degree

[1] Sec. 971.175, Stats. (1975) provides:

"971.175.  **Sequential order of proof.**  When a defendant couples a plea of not guilty with a plea of not guilty by reason of mental

murder[2] of James Armbruster. He was found not to have had at the time of the shooting a mental disease or defect so as to lack "substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law."[3] He was sentenced to life imprisonment.

A motion for a new trial was filed by the office of the Public Defender on January 24, 1977. Writs of error were sought to review the judgment of conviction entered on April 26, 1976, the amended judgment of conviction entered on May 25, 1977, and the order of the trial court denying post conviction motions dated May 25, 1977.

There are three issues presented for review:

1. Was the defendant denied the effective assistance of trial counsel?

2. Should a new trial be granted in the interest of justice on the ground that the question of guilt in the first phase of the trial was not completely tried?

3. Did the district attorney violate his obligation to disclose exculpatory evidence to the defense?

We answer all three questions in the negative, and affirm. The facts leading up to the death of James Armbruster are not in dispute. Neither is the fact that the defendant fired the fatal shot.

disease or defect, there shall be a separation of the issues with a sequential order of proof before the same jury in a continuous trial. The guilt issue shall be heard first and then the issue of the defendant's mental responsibility. The jury shall be informed of the 2 pleas and that a verdict will be taken upon the plea of not guilty before the introduction of evidence on the plea of not guilty by reason of mental disease or defect. This section does not apply to cases tried before the court without a jury."

[2] Sec. 940.01, Stats. 1975, provides:

"940.01. **First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

[3] Sec. 971.15(1), Stats. 1975.

Approximately three days prior to the shooting, the defendant left his home in Watertown, and taking his belongings, he went to a small summer cabin that he owned near Iron River. On Saturday afternoon, August 30, 1975, he invited Nancy and Robert Armbruster over to his cabin to talk and drink wine. Together the three of them drank, in equal proportions, two one-half gallons of wine. The defendant also drank a number of shots of brandy that afternoon. The Armbrusters left the cabin at approximately 7 p.m.

Sometime between 11 and 11:30 p.m. that evening the defendant entered the tavern at the Log Cabin Lodge. He sat down at the bar next to James Armbruster, ordered a drink, and asked Mr. Armbruster if he cared for another drink. Armbruster, who was watching a football game at the time, said "No, thank you. I just received one." The defendant and Armbruster talked for a little while longer, then the defendant got up and walked to the other end of the bar and ordered another drink.

After finishing his drink, the defendant left the bar. He returned at approximately 12:30 a.m. wearing an off-white trench coat which he had not worn previously. He walked out of the Lodge once more and reappeared a few minutes later. James Armbruster was sitting on the second bar stool from the right nearest to the door. As the defendant entered the bar, witnesses observed him carrying a bolt action shotgun. He leveled the gun at Armbruster. Armbruster was still sitting on the bar stool and when the defendant came in, he turned around to his right. At that moment, the defendant, from less than five feet away, fired the shotgun, hitting Armbruster right below the rib cage. Armbruster died of massive internal injuries almost immediately.

The defendant remained stationary after the shooting for a couple of seconds, turned around and then walked

out.  As he walked toward his car, he passed an employee of the Lodge and said, "I shot a man, so what?"

Police officers surrounded the defendant's cabin at 2:30 a.m.  It took them approximately fifteen minutes to arouse him.  According to the arresting officers, the defendant looked like he had been drinking, but he was not confused or dazed.  He appeared to have just awakened.  The officers found a bolt action shotgun in a closet of the cabin.  One spent cartridge was in the chamber and one fully loaded cartridge was in the clip.

At trial, on cross-examination of the state's witnesses, the defendant's counsel attempted to show lack of intent by showing lack of motive for the shooting.  He asked the owners of the Lodge, who had tended bar the night of the shooting, whether any angry words or threatening gestures were exchanged.  According to their testimony, nothing out of the ordinary occurred and, although both men were well known in the area, neither man was known to have had bad feelings toward the other.  The same questions were asked of other witnesses who knew the two men and essentially the same responses were elicited from each.

The defense presented only two witnesses during the guilt phase of the trial, Nancy and Robert Armbruster.  Nancy Armbruster had known both men for approximately ten years.  She saw the defendant frequently during the summer, and she spent time with him every day from the time he arrived at the cabin until the day of the shooting.  Although he would generally discuss his problems with her, he did not mention James Armbruster at all.  He had never discussed James Armbruster with her, except if his name arose "in general conversation."

Robert Armbruster had known both the defendant and James Armbruster all of his life.  During the week prior to the shooting he and the defendant had spent approxi-

mately twelve hours together at various times. The defendant had not mentioned Armbruster's name during that time. Neither had James Armbruster mentioned the defendant's name to Robert Armbruster during the time that they had known each other.

After deliberating for less than three hours, the jury returned a verdict finding the defendant guilty of first degree murder.

During the second phase of the trial, the defense counsel produced three expert witnesses to establish an insanity defense at the time of the shooting. A court-appointed psychiatrist testified, as did a psychiatrist called by the district attorney. The defense also called a number of lay witnesses in an effort to establish a change in the defendant's character prior to the shooting.

It was during the second phase of the trial that the events leading up to the shooting were explored in detail, as was the personal history of the defendant.

At the time of the shooting the defendant was forty-three years old, married, and the father of seven children. He had been employed at Allis Chalmers for nineteen years, and until the shooting, he had no criminal record.

The defendant, during each of his psychiatric interviews, detailed basically the same set of facts. "The focus of attention" from his point of view, according to a clinical psychologist called by the defense, began during a sandlot football game, after high school and just prior to the time that the defendant was scheduled to begin college. The defendant, who was seventeen years old at the time, was tackled by James Armbruster. Armbruster struck the defendant with his elbow causing an injury to the defendant's mouth that required sutures and bandages. He was required to be on a liquid diet for several weeks afterwards. The defendant felt that the injury

was a substantial factor in his failure to complete college.

The defendant also suffered from a severe hearing loss estimated to be at eighty percent. He did not have a hearing aid although one would have helped to correct his impairment. According to the defense experts, the hearing loss contributed to the defendant's mental illness.

The defendant had also been having marital difficulties as well as problems at work. He had been demoted at work in June, 1975, and began to drink heavily. In the spring of 1974 he started taking diet pills and as a result he reduced his weight from 250 pounds to 185 pounds.

The defendant went to the cabin on Wednesday prior to the shooting, leaving two days earlier than he had planned for vacation, packing all of his clothes into the car and taking his dog with him. He intended to do some yard work, fix the mower and get the cabin ready for winter.

On Wednesday night, he went to a tavern where he got involved in an argument with a bartender over some change. The dispute was serious enough so that the defendant wanted the police to be called, but he decided to forget it and go home.

On Friday he was playing cribbage at another bar and was accused of cheating by one of the players. A shotgun was "pulled" by one of the other players but after the police were called, the defendant agreed to go home. Instead, he went to another bar where another of the cribbage players threatened him.

The defendant contacted a retired state patrolman about the incidents and told him that he had called the F.B.I. but was informed that they did not have jurisdiction. The defendant told this individual that he had a note in his "glass case" and that if something should happen to him, he wanted the glass case to be checked.

On Saturday morning, the defendant practiced firing his shotgun in case he needed it for protection. After drinking with Nancy and Robert Armbruster that afternoon, he decided to go out. He went to approximately five bars and had approximately six more drinks. He ended up at the Log Cabin Lodge and, noticing that the place was crowded and that only one seat was open, he sat down next to James Armbruster. According to the defendant, as he attempted to describe all the events that had happened to him during the preceding days, Armbruster said, "Well, Dick, if they don't get you, I will." The defendant described himself as going into a trance and repeating to himself, "Dick, you've got to get him."

He went to his cabin and loaded his shotgun, making sure he got slugs rather than buckshot because he did not want anyone else to get hurt. At first he put two slugs in the gun, then thought that if someone stopped him or if he did not kill James Armbruster, he did not want to allow the gun to be used on himself. He told at least one medical expert that he took one of the slugs out at that point.

The defendant, taking the gun and a white coat, drove back to the Log Cabin Lodge, parking his car in a spot where "no one could trap him." He looked in to see if Armbruster was still there, went back to the car, got the gun, walked in, aimed and fired.

One of the experts called by the defendant described Mr. Roe's reaction to the shooting:

"Mr. Roe related the incidents to it like a teacher, he was smiling, he took great pride in detail, he took great pride that he could do this, he saw himself and he saw this act of taking another man's life, this particular man's life, as really doing the community a service. He felt that Mr. Armbruster had violated the morals of the community and the standards of the community and the laws of the community himself and had never been

reprimanded for it and somebody had to do it, and Richard Roe did it."

The psychiatrist called by the court stated:

". . . he recalled a feeling of exhilaration or feeling of well-being like everything was changing, that he now could love his job and love everybody. He thinks that that feeling came about when he saw Jim lying on the floor. He is aware of—and at that point I am referring to at that time he was aware of continuing—that is at the time I examined Mr. Roe, he was stating that he continued to have a good feeling about the sequence of events although he was sorry that it happened. And that he explained the good feeling was related to the fact that he had an old score to settle with Jim Armbruster."

Another psychiatric witness who testified for the defense stated:

". . . the fact that he could commit an act like this without really realizing the true nature of what he was doing; the fact that he could feel that resurrection; the fact that he could simply go home and go to sleep without really feeling any guilt or any remorse for this act; the fact that he felt that he had been a hero, that he had saved himself, that he had committed a manly act; all these things are gross distortions of reality and are definitely in keeping with the diagnosis of paranoid schizophrenia."

The ultimate conclusion of the psychiatric witnesses were as follows. The three experts for the defense concluded that to a reasonable medical or psychological certainty at the time of the shooting, the defendant lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law. He was diagnosed as a paranoid schizophrenic.

The psychiatrist called by the court testified that Mr. Roe's actions were handicapped by some depression, his

inability to use good judgment, and in the amount of alcohol that he consumed which reduced the defendant's normal inhibitions for conforming his behavior to the requirements of the law. He also testified that if Mr. Armbruster had been a "little friendlier," Mr. Roe could have tolerated him but that the meeting mobilized an intense anger. It was his ultimate opinion that the defendant was not suffering from a mental disease or defect which would substantially interfere with his capacity to appreciate the wrongfulness of his conduct. However, he did express the opinion that it was "obvious" that the defendant was unable to conform his conduct to the requirements of the law, but it was not because of mental disease.

The psychiatrist called by the district attorney testified that he could not substantiate the presence of a mental disease or defect which would have impaired the defendant's ability to appreciate the wrongfulness or to conform his conduct to the requirements of the law. He stated further that if Mr. Roe had been sober, he would have been surprised if the offense would have occurred.

Mr. Roe testified at the post conviction hearing that he had not seen Armbruster for approximately six months before the night of the shooting. He said that the last personal contact that he had with James Armbruster was in the 1949 football game in which the defendant was injured.

Additional facts will be set forth in the balance of this opinion.

## I. WAS THE DEFENDANT DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL?

■
The test for determining the competency of counsel is whether the representation rendered is ". . . equal

to that which the ordinarily prudent lawyer, skilled and versed in criminal law, would give to clients who had privately retained his services." *State v. Harper*, 57 Wis.2d 543, 557, 205 N.W.2d 1 (1973); *Weatherall v. State*, 73 Wis.2d 22, 26–27, 242 N.W.2d 220 (1976); *State v. Koller*, 87 Wis.2d 253, 263–264, 274 N.W.2d 651 (1979). This court has approved the American Bar Association Project On Standards For Criminal Justice, *Standards Relating To The Prosecution Function And The Defense Function,* secs. 3.1(c), 3.2, 3.6, 3.9, 4.1, 5.2 and 8.6 (Approved Draft, 1971) as partial guidelines to the determination of effective representation. However, the violation of these standards does not automatically determine incompetency or ineffectiveness of the representation. *State v. Harper*, 57 Wis.2d at 557; *State v. Simmons*, 57 Wis.2d 285, 292, 298, 203 N.W.2d 887 (1973). Each case must be examined and treated upon its own facts. Effective representation is not to be equated with a not guilty verdict. *State v. Harper*, 57 Wis.2d at 557. Furthermore, with only limited exceptions, a lawyer has the right to select the defense position to be pursued from among the alternative defense strategies available. *State v. Koller*, 87 Wis.2d at 264; *Weatherall v. State*, 73 Wis.2d at 26.

The public defender represented Mr. Roe following the conviction. His new counsel cites two areas in the trial counsel's defense of Mr. Roe, which he contends require a new trial based on the ineffective assistance of counsel. He claims that trial counsel: (1) failed to present a defense based on an intoxication theory, and (2) failed to investigate the circumstances leading up to the crime which precluded trial counsel from making a decision as to whether evidence could be offered to support a lesser degree of homicide.

He argues that the trial attorney for Mr. Roe should have presented expert testimony on the issue of Mr.

Roe's capacity to form the requisite intent to kill by reason of voluntary intoxication.

Expert testimony as to whether the defendant was intoxicated to such an extent that he did not have the capacity to form the intent necessary to commit the crime charged is generally admissible at trial. *Loveday v. State,* 74 Wis.2d 503, 513–514, 247 N.W.2d 116 (1976). Voluntary intoxication is a defense under sec. 939.42(2), Stats.[4] if the existence of the state of mind is negated by the condition of the defendant. The defendant must show that the alcohol had more than an adverse effect on his judgment. He must show that the actual effect of the alcohol on his mind was so severe that he was "utterly incapable" of forming the intent to kill. *Jones v. State,* 69 Wis.2d 337, 346, 230 N.W.2d 677 (1975).

Although the medical experts disagreed to some extent as to the degree of effect that alcohol played in reducing Roe's inhibitions, all the medical experts testified at trial that Mr. Roe intended to kill Mr. Armbruster and that he had excellent recall of events. Roe's trial attorney received reports from three experts prior to the trial. Two of the experts stated in their reports that Mr. Roe fully intended to kill Mr. Armbruster. Neither report analyzed the precise effect that alcohol may have had on Mr. Roe. But given their statements on intent it cannot be said that trial counsel was ineffective in failing to pursue a vigorous defense based on intoxica-

---

[4] "939.42. **Intoxication.** An intoxicated or a drugged condition of the actor is a defense only if such condition:

"(1) Is voluntarily produced and renders the actor incapable of distinguishing between right and wrong in regard to the alleged criminal act at the time the act is committed; or

"(2) Negatives the existence of a state of mind essential to the crime."

tion when the facts supplied to him by his own experts showed that no such defense existed.

At the post conviction hearing, Roe's trial counsel stated that he went to the Iron River area the day after the shooting and went into the Green Top Bar because he had been told that Roe was there before going to the Log Cabin Lodge. Without identifying himself, he asked whether Roe was drunk that evening. The bartender said no, that he saw Mr. Roe and he "wasn't drunk at all and looked just fine to me." The witnesses at trial who were at the Log Cabin Lodge, did not notice anything unusual about Roe's mannerisms or speech.

Post conviction counsel cites the testimony of the expert witnesses on the issue of intoxication. The testimony, however, only indicated that alcohol reduced Roe's inhibitions, his "conscious control," and his "normal inhibitions." But these observations by the medical experts do not reflect the defendant's capacity to form the requisite intent to kill at the time of the shooting.

We conclude the record does not show that Mr. Roe's trial counsel was ineffective in failing to pursue the intoxication defense any further than he did at trial.

It is alleged that trial counsel failed to interview certain individuals who perhaps could have provided information to support a theory of "self defense, heat of passion, or any other defense."

Sec. 4.1 of the A.B.A. *Standards Relating To The Prosecution Function And The Defense Function* (Approved Draft, 1971) approved in the *State v. Harper* decision outlines defense counsel's duty to investigate:

"4.1. **Duty to investigate.** It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and degree of guilt or penalty. The investigation should always include efforts to secure

information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or his stated desire to plead guilty."

The duty to investigate extends to the exploration of whether the defendant possessed the requisite intent or capacity to commit the offense charged when it is not disputed that the defendant performed the act in question. Commentary to sec. 4.1, *Standards Relating To The Prosecution Function And The Defense Function.*

Trial counsel did not conduct interviews of the bartenders at the taverns where the defendant had gotten into arguments prior to the shooting. Nor did he interview individuals present at the cribbage game where one of the players pulled out a shotgun. Nor did he interview another individual who Roe quarreled with on the day before the shooting. During that incident, Roe, who had known the other person for some time, called him a "freeloader." That individual then asked Roe, "Should I slay you here or should I take you outside and slay you?" In addition, trial counsel did not seek to locate anyone who had been involved in the football game in which Mr. Roe was injured.

Although he did not conduct personal interviews, trial counsel possessed most, if not all, of the information available from these individuals from the reports submitted to him by Drs. Lorenz and Polder. It would have served no purpose for him to have personally conducted interviews of these individuals unless he intended to rely on their testimony. Much of this information was introduced in the insanity phase of the trial by defendant's counsel through both medical experts and through the testimony of Nancy and Robert Armbruster, with whom the defendant discussed the argument with the bartender over change on Wednesday; the shotgun pointing inci-

dent at the cribbage game; and the defendant's telephone call to the F.B.I.

Roe's trial counsel at the post conviction hearing said that he talked to a number of people about the shooting, and to several deputies to learn about the comparative reputations of Roe and Armbruster. He said that he did not obtain the names of the people that he talked to. He further stated that after talking with an unnamed individual who was at the bar, and after the "preliminary examination" he became convinced that the district attorney would be able to place Mr. Roe "in the time and the place" through the testimony of "many, many people." He stated there was no doubt that Mr. Roe would be convicted "on one thing or another in the first phase of the trial." He stated that he made four or five trips to Iron River in the course of his investigation.

The public defender also asserts that trial counsel did not obtain or seek to find witnesses to testify as to the change in character in Mr. Roe prior to the shooting. However, during the insanity phase of the trial, defendant's attorney introduced evidence of Mr. Roe's change in character through a number of witnesses. The Roes' clergyman testified to the personality and marital difficulties experienced by Mr. Roe. A nurse and an orderly testified that they observed unusual behavior on the part of Mr. Roe when he entered the hospital for a possible ulcer. He told the nurse that his wife was trying to poison him. Trial counsel also attempted to demonstrate a change in character consistent with the insanity defense presented, through the testimony of a neighbor of Mr. Roe in Iron River; a retired employee of the State Highway Patrol whom Mr. Roe contacted the night before the shooting to report the threatening remarks

made to him at a card game; the testimony of Nancy and Robert Armbruster; and the defendant's eighteen year old son detailing the changes in the defendant's character, drinking habits, and his marital problems.

Contrary to the public defender's assertion that trial counsel failed to investigate the circumstances surrounding the shooting and leading up to the shooting, trial counsel conducted a detailed investigation. It is true that he did not, after obtaining the facts, conduct a personal interview with every individual coming into contact with the defendant during the weeks and months before the shooting. However, Mr. Roe's trial counsel testified at the post conviction hearing that he did not want to have Roe's injury at the football game some twenty years before brought out at trial because he was afraid that that would provide a motive for the killing which would lead the jury to the conclusion that Roe intended to kill Armbruster. He further stated that he did not pursue self defense or manslaughter defenses in great detail because of the twenty to thirty minute time interval between the conversation between Roe and Armbruster and the shooting. He also did not want to have to put Mr. Roe on the stand because he did not want him to incriminate himself and because he felt that the prosecution would have easily established a motive. We believe that this approach, under the factual situation presented in the case at bar, was a reasonable one. Trial counsel was not ineffective in his investigation or handling of the case.[5]

---

[5] The defendant's post conviction counsel points to five other "failures" of defense counsel without detailing how those "failures" specifically rendered the representation of Mr. Roe inadequate. Upon careful review of the record, we do not believe that these alleged errors, either individually or cumulatively rendered trial counsel's representation of Mr. Roe inadequate.

## II. SHOULD A NEW TRIAL BE GRANTED IN THE INTEREST OF JUSTICE ON THE GROUND THAT THE QUESTION OF GUILT IN THE FIRST PHASE OF THE TRIAL WAS NOT COMPLETELY TRIED?

Finding as we do that trial counsel for the defendant was not ineffective, we have been requested nevertheless to exercise our discretionary power to grant a new trial in the interest of justice because the full controversy concerning the defendant's guilt was not tried in the first phase of the trial. Sec. 751.06, Stats. 1977, provides:

"751.06. **Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

The standard applied by this court in determining whether to grant a new trial in the interest of justice is well established. A new trial in the interest of justice is to be granted only in the event of a probable miscarriage of justice, and only with some reluctance and great caution. *Zebrowski v. State,* 50 Wis.2d 715, 731, 185 N.W.2d 545 (1971) ; *Garcia v. State,* 73 Wis.2d 651, 245 N.W.2d 654 (1976) ; *Lofton v. State,* 83 Wis.2d 472, 489–490, 266 N.W.2d 576 (1978) ; *Rogers v. State,* 93 Wis.2d 682, 694, 287 N.W.2d 774, 779 (1980). The test is not whether it is possible that a different result might

occur if a new trial was held. "It must appear, with a substantial degree of probability, that a different result will be produced." *State v. Boyce,* 75 Wis.2d 452, 463, 249 N.W.2d 758 (1977).

Specifically, it is argued that at the post conviction hearing evidence was presented which established a defense based on manslaughter through the exercise of the imperfect right of self-defense. Sec. 940.05(2), Stats. 1975.[6] The evidence presented at the post conviction hearing was extensive. Post conviction counsel contends that almost no defense was presented in the guilt phase of the original trial, and that this failure to pursue a mitigating defense was tantamount to a plea of guilty. It is argued that the cumulative testimony produced at the post conviction hearing, including the expert medical testimony; prior acts of violence on the part of Armbruster and his reputation and character for violence; the defendant's own testimony as to his fear; and the incidents occurring to the defendant during the week prior to the shooting, show that the defendant believed that he had the right to use deadly force in self-defense even though that belief was unreasonable under the circumstances. We need not examine each item of evidence offered at the post conviction hearing to determine its admissibility, for it is clear, from the defendant's own testimony, that he did not believe he had the right to act in self-defense.

The crime of manslaughter based on the imperfect right of self-defense arises only if the defendant believes

---

[6] Sec. 940.05(2), Stats. 1975, provides:

"940.05. **Manslaughter.** Whoever causes the death of another human being under any of the following circumstances may be imprisoned not more than 10 years: . . . (2) Unnecessarily, in the exercise of his privilege of self-defense or defense of others or the privilege to prevent or terminate the commission of a felony; . . ."

that the act causing death was necessary in the exercise of self-defense but that the belief was unreasonable under the circumstances. *State v. Mendoza,* 80 Wis.2d 122, 150–151, 258 N.W.2d 260 (1977); *State v. Johnnies,* 76 Wis.2d 578, 583, 251 N.W.2d 807 (1977); *Bedford v. State,* 65 Wis.2d 357, 364, 222 N.W.2d 658 (1974); *Day v. State,* 55 Wis.2d 756, 760, 201 N.W.2d 42 (1972); Wis J I—Criminal Part II, *Manslaughter: Causing Death Of Another Unnecessarily In The Exercise Of Self Defense,* approved as a court statement of the law in *Mitchell v. State,* 47 Wis.2d 695, 177 N.W.2d 833 (1970).

A portion of the defendant's testimony at the post conviction hearing is as follows:

"*Q.* Then why did you put a shell in the gun? . . .
"*A.* I did not intend to shoot Jim Armbruster.
"*Q.* Why did you put the shell in the gun?
"*A.* It depends on Jim's reaction. If he had come toward me I would have shot through the floor to stall him, to bluff him, it was just for bluff purposes. That's the only reason there was a shell in that gun. . . .
"*Q.* Why did you return to the Log Cabin Lodge after you left it?
"*A.* To get the upper hand with Jim.
"*Q.* Why didn't you just stay at home?
"*A.* I did go home.
"*Q.* Why didn't you stay there?
"*A.* Because I wanted to return to the Log Cabin.
"*Q.* Why did you want to return there?
"*A.* To get the upper hand with Jim Armbruster. . . .
"*Q.* Now you said that when you left the house with the gun that you intended to get the upper hand on Jim Armbruster?
"*A.* That's right.
"*Q.* What do you mean by that?
"*A.* Well, just have him at my command.
"*Q.* What were you going to command him to do?
"*A.* No longer would I be scared that I would have him scared of me. That is generally what my intentions were."

From this testimony it is apparent that Mr. Roe did not believe that the force employed by him was necessary to prevent or terminate what he believed (whether that belief was reasonable or otherwise) to be an unlawful interference with his person. He did not believe that the force used was necessary to prevent eminent death or great bodily harm to himself.

We further note that at the post conviction hearing the defendant stated that he did not intend to kill James Armbruster. A person exercising self-defense or the imperfect right of self-defense intends to use force or threaten force against another for the purpose of self-defense. *State v. Johnnies,* 76 Wis.2d at 584. Although there was overwhelming evidence that the defendant did intend to kill Mr. Armbruster, we believe that the express disavowal of any intent to kill is another factor militating against the granting of a new trial in the interest of justice.

From the foregoing it is evident that the case at bar does not resemble prior situations where we have exercised our discretionary power of reversal. *See, Garcia v. State,* 73 Wis.2d 651, 245 N.W.2d 654 (1976) ; *Logan v. State,* 43 Wis.2d 128, 168 N.W.2d 171 (1969) ; *Pate v. State,* 61 Wis.2d 25, 211 N.W.2d 495 (1973).

III. *DID THE DISTRICT ATTORNEY VIOLATE HIS OBLIGATION TO DISCLOSE EXCULPA-TORY EVIDENCE TO THE DEFENSE?*

Dr. Mercer, the court's expert witness, spoke with the district attorney on two occasions prior to trial. His testimony at the post conviction hearing states in part:

". . . The question may have been raised by me as to whether the defense had considered pleading guilty to a lesser charge, and in my recall, that the district at-

torney, Tom Fox, had some real doubt in regard to whether he could consider a lesser charge. . . .

"Well, I think that it may have come into the context of my feeling that there were a number of factors which did diminish Mr. Roe's ability to be responsible for his actions, and that in that context I may have asked Mr. Fox if the defense had considered a plea other than that, whether they had considered another plea other than not guilty by reason of insanity, and considered a guilty plea on a lesser charge. . . .

"I had preparations. Mr. Fox had preparations. I had to consult with other colleagues in regard to whether there was any alternative other than the charge of first degree murder."

Dr. Mercer also testified that he did not discuss the legal appropriateness of the first-degree murder charge with the district attorney. He said that he did not consider himself that knowledgeable concerning the distinction between the varying degrees of murder and manslaughter. In addition, the district attorney's own expert psychiatric witness stated that he raised the question with the district attorney as to whether first-degree murder was an appropriate charge and whether the killing was in reality a case of manslaughter.

We are dealing in this case with the defendant's right to a fair trial mandated by the Due Process Clause of the Fourteenth Amendment. *United States v. Agurs,* 427 U.S. 97, 107 (1976).

The defendant's trial attorney made a general demand for "all exculpatory evidence" in the state's possession prior to trial in addition to a more specific demand for certain items of evidence. It is admitted that the comments of the psychiatrists to the district attorney would not fall within the scope of the requests for specific items of evidence. In such situations, "[i]f there is a

duty to respond to a general request of. . .[this] kind, it must derive from the obviously exculpatory character of certain evidence in the hands of the prosecutor." *United States v. Agurs,* 427 U.S. at 107. Both the nature of the allegedly exculpatory evidence, and the overall evidence in the record concerning guilt, must be examined.[7] "It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs,* 427 U.S. at 112–113.[8]

The opinions of the psychiatrists regarding the appropriate degree of criminal responsibility with which to charge the defendant were not of a magnitude to create a reasonable doubt which did not otherwise exist. The

---

[7] We do not believe that the district attorney's failure to disclose in this case should be examined with the strict scrutiny that would apply if this were a case of the prosecution's knowing use of perjured testimony. *See, Mooney v. Holohan,* 294 U.S. 103 (1935). We do not believe that the case at bar bears any resemblance to a situation where perjury is employed to secure a conviction.

[8] "It appears, therefore, that under the standard of *Agurs,* unless the evidence not disclosed is probative of innocence, no duty to disclose arises, and only if the evidence not disclosed would have created a reasonable doubt was constitutional error committed by the non-disclosure." *Ruiz v. State,* 75 Wis.2d 230, 241–242, 249 N.W.2d 277 (1977). *See also* Note, *The Prosecutor's Duty To Disclose After United States v. Agurs,* 1977 U. Ill. L.F. 690.

medical opinions of the psychiatrists, based on their examination of the defendant, were disclosed to the defendant's counsel prior to trial.

The psychiatrists are not legal experts, they are medical experts, and although they may testify as to the ultimate facts at issue, when a proper foundation for their testimony has been laid, they are not competent to give an opinion as to the guilt or innocence of the defendant as to any particular degree of murder or manslaughter. Sec. 907.04, Stats. (1977) ;[9] *accord, Rabata v. Dohner,* 45 Wis.2d 111, 172 N.W.2d 409 (1969). The statements of the psychiatrists amounted to nothing more "than an expression of . . . [their] general belief as to how the case should be decided. . . ." McCormick, *Handbook On The Law Of Evidence,* sec. 12 (2d Ed. 1972) ; *Marx & Co., Inc. v. Diner's Club, Inc.,* 550 F.2d 505, 510 (2d Cir. 1977) ; *Grismore v. Consolidated Products Co.,* 232 Ia. 328, 5 N.W.2d 646 (1942).

Thus, we conclude that the opinions of the psychiatrists were not exculpatory because they were not probative of the defendant's innocence of the crime charged. We also note that the evidence in the record of this case was overwhelming that Mr. Roe was guilty

---

[9] Sec. 907.04, Stats. 1977, provides:

"907.04. **Opinion on ultimate issue.** Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

*See also,* sec. 907.02, Stats. 1977. The expert must be qualified to give the opinion and the testimony must be of assistance to the trier of fact. That section provides:

"907.02. **Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

of first degree murder. Thus, the district attorney had no duty to disclose these statements by the psychiatrists.

The final alleged error concerns the failure of the prosecutor to disclose a note written by a police officer in Iron River. The note confirmed that an unidentified individual called the F.B.I. in Milwaukee from Iron River saying that the "whole town was against him." This note was not revealed to defense counsel before trial. The existence of the note was brought out on cross-examination of one of the state's witnesses during the insanity phase of the trial. Evidence that the call had been made by Mr. Roe was presented at trial by more than one witness, but it is alleged here that the memorandum was "exculpatory" and requires reversal. The note merely confirmed what information the defendant's counsel already had acquired and which was presented to the jury. No error occurred in the failure of the district attorney to produce the note at trial.

*By the Court.*—Judgment and order affirmed.

CALLOW, J., took no part.