STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Elmer F. WYSS, Defendant-Appellant.

Supreme Court

*No. 83–818–CR. Argued April 3, 1985.—Decided June 28, 1985.*

(Also reported in 370 N.W.2d 745.)

684

685

For the plaintiff-respondent-petitioner the cause was argued by *Devid J. Becker*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

For the defendant-appellant there was a brief by *Stephen M. Glynn, Susan W. Brenner* and *Shellow, Shellow & Glynn, S.C.*, Milwaukee, and oral argument by *Stephen M. Glynn*.

WILLIAM A. BABLITCH, J. The State of Wisconsin (State) petitions for review a decision of the court of appeals which granted the defendant, Elmer F. Wyss (Wyss), a new trial, in the interest of justice. In a jury trial which commenced on July 20, 1982, Wyss was found guilty of the first-degree murder of his wife, Dorthy Wyss. We find from a review of the record that the circumstantial evidence in this case was strong enough to exclude to a moral certainty every reasonable hypothesis

of the defendant's innocence. We hold that before a new trial may be granted because of an alleged miscarriage of justice, the reviewing court must find a substantial degree of probability that a new trial will produce a different result. The court of appeals failed to make that finding and therefore erred as a matter of law in granting the new trial. We conclude there is hardly a remote possibility, much less a substantial degree of probability, that a new trial would produce a different result. Accordingly, we reverse the court of appeals and reinstate the judgment of conviction.

Before we discuss the facts in this case and the issues raised on review, it is necessary to discuss the posture in which this review reached this court and the reasons why we consider and determine all issues raised. Following Wyss' conviction on July 27, 1982, it was learned that John L. Brayshaw (Brayshaw), the foreperson of the jury, was not a resident of Dane county and that he had failed to disclose this and other background information in a juror questionnaire and on *voir dire*. The defendant promptly moved the circuit court for a mistrial and an order vacating the judgment. Following an evidentiary postconviction hearing, the trial court denied the motion for mistrial concluding that (1) the defendant was not denied his constitutional right to a jury of the county in which the crime occurred because no governmental action was involved in abridging this right; and (2) there was no evidence that the juror's misrepresentations regarding background information revealed bias against the defendant.

The defendant subsequently appealed from the judgment convicting him of first-degree murder and from the order denying his postconviction motion. In an unpublished opinion, the court of appeals rejected Wyss' contention that the evidence was insufficient to support his conviction and that the trial court's evidentiary rul-

ings entitled him to a new trial. The court of appeals also rejected Wyss' contentions that he was denied his constitutional right to a trial before a jury of county residents and that he was entitled to a new trial, as of right, because of a juror's inaccurate answers in a juror questionnaire and on *voir dire*. Having found no prejudicial error, the court of appeals nevertheless chose to exercise its discretion, pursuant to sec. 752.35, Stats., and ordered a new trial in the interest of justice. The court of appeals found that the closeness of the case, and the lack of juror candor "convince us that justice probably has miscarried and we should order a new trial."

The State subsequently filed a petition for review, pursuant to sec. 808.10, Stats., to test the propriety of the court of appeals' grant of discretionary reversal. In a letter to this court, the defendant stated that because he was the prevailing party at the court of appeals' level, the decision of the court of appeals was not adverse to him under Rule 809.62(1). Consequently, the defendant stated that it was his understanding of *Neely v. State*, 89 Wis. 2d 755, 279 N.W.2d 255 (1979), that he could not petition for cross-review on his alleged claims of error which were denied by the court of appeals. However, he indicated that he would argue these issues if this court granted the State's petition for review. This court did grant the State's petition for review and the defendant fully briefed his alleged claims of error for our review.

In *Neely* we stated: "Because the decision is only the result reached by the court of appeals in a case, a party to whom the result is favorable may not petition for review of the decision simply because that party disagrees with the rationale expressed in the opinion." *Id.* at 758. While *Neely* is a correct articulation of the law, its holding does not bar the prevailing party from raising its issues upon this court's granting of the losing

party's petition for review. *See cf. Neely* at 757, n. 1; *State v. Alles,* 106 Wis. 2d 368, 383–395, 316 N.W.2d 378 (1982) ; *Auric v. Continental Cas. Co.,* 111 Wis. 2d 507, 516, 331 N.W.2d 325 (1983).

In *Neely,* the defendant conceded that if this court granted his petition for review, the State could raise its issue upon the granting of his petition for review. *Neely* at 757, n. 1. Although this court did not reach or decide the question of whether the prevailing party in the court of appeals can always challenge the reasoning in the court of appeals' opinion upon the granting of the losing party's petition for review, this question was implicitly answered by the rationale expressed in *State v. Alles.*

In *State v. Alles,* this court discussed the need for the state (respondent) to file a cross-appeal in the court of appeals, pursuant to sec. 809.10(2)(b), Stats., to challenge a nonfinal order of the circuit court which was unfavorable to the state when the defendant appealed from his conviction. This court stated that the state could challenge the non-final order in its brief, without filing a notice of review under sec. 974.05(2), or a cross-appeal "when all that is sought is the raising of an error which, if corrected, would sustain the judgment. . . ." *Alles* at 390. We explained that the rationale for permitting a respondent to raise the issue in its brief "is the accepted appellate court rationale that a respondent's judgment or verdict will not be overturned where the record reveals that the trial court's decision was right, although for the wrong reason. An appellate court, consistent with that precept, has the power, once an appealable order is within its jurisdiction, to examine all rulings to determine whether they are erroneous and, if corrected, whether they would sustain the judgment or order which was in fact entered." *Id.* at 391. This policy, which underlies appellate practice, extends to this court as well. Thus, once a petition to review has been granted, this court has the power to examine all rulings of the

circuit court to which objection was properly preserved and all conclusions reached by the court of appeals which are raised by the respondent's brief, to determine whether they are erroneous, and whether if corrected they would sustain the judgment or order of the circuit court or the decision rendered by the court of appeals. Therefore, after examining the briefs and the record, this court has decided to review the entire appeal in this case.

We therefore consider the following issues for review:

1. Was the evidence sufficient to support a conviction of first degree murder beyond a reasonable doubt? We conclude that the evidence was sufficiently strong to exclude to a moral certainty every reasonable hypothesis of innocence and was therefore sufficient to support Wyss' conviction of first-degree murder beyond a reasonable doubt.

2. Was Dr. Hann's testimony regarding statements made by Dorthy Wyss to him in the course of his medical treatment of her concerning her attitudes toward the defendant properly admitted? We conclude that this evidence was properly admitted.

3. Was evidence of the defendant's character trait of jealousy properly admitted? We conclude that this evidence was properly admitted.

4. Was testimony concerning an alleged threat made by the defendant to the victim properly admitted? We conclude that it was properly admitted.

5. Did the participation of juror Brayshaw, who was not a Dane county resident at the time of the trial, deny the defendant his constitutional right to a fair and impartial jury of the vicinage? We conclude that it did not.

6. Did juror Brayshaw's lack of candor in answering the juror questionnaire and on *voir dire* deny the defendant due process of the law because it allegedly prevented an informed use of the defendant's peremptory jury challenge? We conclude that it did not.

7. Did the court of appeals err as a matter of law in exercising its discretion when it granted a new trial in the interest of justice without first finding that there was a substantial degree of probability that a new trial would produce a different result? We conclude that it did.

8. Should this court grant discretionary reversal of the defendant's conviction in the interest of justice? We conclude that we should not.

## I. *Sufficiency of the Evidence*

The defendant argues that the jury's verdict of guilty is fatally inconsistent with constitutional guaranties of due process in that it is based upon evidence insufficient to support a conviction under the beyond a reasonable doubt standard constitutionally mandated for all criminal proceedings. We disagree.

The defendant was convicted of the first-degree murder of his wife, Dorthy Wyss, which occurred on November 17, 1981, in their Mount Horeb home. At trial, the State produced no direct evidence of Wyss' guilt, but relied solely upon circumstantial evidence.

A finding of guilty may rest upon evidence that is entirely circumstantial. *Struzik v. State,* 90 Wis. 2d 357, 363, 279 N.W.2d 922 (1979). In fact, this court has noted that: "[o]ften times circumstantial evidence is stronger and more satisfactory than direct evidence." *Clark v. State,* 62 Wis. 2d 194, 197, 214 N.W. 450 (1974).

Regardless of whether the evidence is direct or circumstantial, it must be sufficiently strong and convincing to establish the facts beyond a reasonable doubt in the mind of the triers of facts. *State v. Lund,* 99 Wis. 2d 152, 161, 298 N.W.2d 533 (1980). In order for circumstantial evidence to meet this demanding "beyond a reasonable doubt" standard, the trier of fact must be convinced that the evidence is sufficiently strong to exclude to a moral certainty every reasonable hypothesis of inno-

cence. *Id.* This court has explained the proper use of circumstantial evidence by a jury as follows:

"[W]hen circumstantial evidence is relied upon, this evidence must be sufficiently strong to exclude every reasonable hypothesis of innocence. This does not mean that, if *any* of the evidence brought forth at trial suggests innocence, the jury cannot find the defendant guilty. The function of the jury is to decide which evidence is credible and which is not, and how conflicts in the evidence are to be resolved. The jury can thus, within the bounds of reason, reject testimony suggestive of innocence. The rule that the circumstantial evidence must exclude every reasonable theory of innocence refers to the evidence which the jury could have believed and relied upon to support its verdict." *Peters v. State,* 70 Wis. 2d 22, 34, 233 N.W.2d 420 (1975). (Footnotes omitted.)

In reviewing the record to determine whether sufficient evidence was presented to warrant a conviction, this court must consider the evidence in a manner that is most favorable to the state. *State v. Stanfield,* 105 Wis. 2d 553, 563–64, 314 N.W.2d 339 (1982). We have stated that the following test is the appropriate one for a reviewing court to apply when the defendant challenges the sufficiency of the evidence:

" 'The test is not whether this court is convinced of the defendant's guilt beyond a reasonable doubt, but whether this court can conclude that the trier of fact could, acting reasonably, be convinced to the required degree of certitude by the evidence which it had a right to believe and accept as true. Reversal is only required when the evidence considered most favorably to the state and the conviction is so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as 'beyond a reasonable doubt.' (citations omitted)." *Id.* at 564, *quoting State v. Burkman,* 96 Wis. 2d 630, 643, 292 N.W.2d 641 (1980).

When the conviction is based solely upon circumstantial evidence, as in the case presently before us, this court must uphold the conviction if a reasonable trier of fact could be convinced that the evidence is strong enough to exclude to a moral certainty every reasonable hypothesis of innocence. *Stanfield* at 564; *Frankovis v. State,* 94 Wis. 2d 141, 148, 287 N.W.2d 791 (1980). The credibility of the witnesses, including the defendant's, and the weight of the evidence, is exclusively for the trier of fact. *Whitaker v. State,* 83 Wis. 2d 368, 377, 265 N.W.2d 575 (1978).

After reviewing the record, we conclude that the evidence presented was sufficient to convince the jury, to a moral certainty, that there was no reasonable hypothesis of the defendant's innocence. Thus, the evidence was sufficient to convince a reasonable jury beyond a reasonable doubt that Wyss was guilty of the first-degree murder of his wife, Dorthy Wyss. The facts upon which we base this conclusion are as follows:

About 6:00 p.m. on November 17, 1981, John Wyss found his mother, Dorthy Wyss, lying dead on the floor in the basement recreation room of the Wyss' Mount Horeb home. A pathologist determined that she had died between 2 a.m. and 12:00 noon on November 17 from loss of blood due to multiple knife wounds. He testified that her throat had been slashed from ear to ear down to the vertebra, severing the major blood vessels, the arteries and veins on both sides. Death was nearly instantaneous after receiving this wound. There were 33 stab and cut wounds in the area of the upper chest, and 12–20 slash wounds on the neck. There was a deep sawing groove in one of the 3 exposed vertebra. The fingers of both her left and right hands had at least two slash wounds which the pathologist classified as de-

fensive wounds. He testified that the defensive wounds were probably received prior to the time Dorthy Wyss' throat was slashed. He further testified that all the wounds were somewhat jagged and irregular, and were consistent with the type of wounds a dull serrated kitchen knife would produce. Such a knife, with a blade of approximately 4½ inches, was found partially obscured beneath Dorthy Wyss' right arm. The deep sawing groove in the fourth cervical vertebra matched the serrated edge of this knife. Blood on the knife was consistent with that of the victim's.

Four people were in the Wyss home on the night of Dorthy Wyss' murder: the defendant, Dorthy Wyss, and their two children, JoReen Wyss (age 13) and John Wyss (age 17).

The jury heard evidence that the defendant attended a basketball game the night of November 16 while Dorthy Wyss was at various bars in Mt. Horeb. A friend of Dorthy Wyss', with whom she had been drinking, testified that she brought Dorthy Wyss home about 1:00 a.m. A chemist with the State Crime Laboratory testified that Dorthy Wyss' blood alcohol level was 0.21 percent.

The defendant testified that he returned home about 9:45 p.m., watched television and went to sleep in the ground floor bedroom which he shared with his wife. He testified that he did not sleep well that night and awoke at approximately 1:00 a.m. when he heard Dorthy Wyss come home. He testified that immediately after she came home, he heard her vomiting in the bathroom. He went back to sleep. He awoke later and heard her vomiting in the basement recreation room. He testified that it was not unusual for her to sleep in the recreation room on a sleeping couch. He arose, cleaned the kitchen at approximately 2:20 a.m., went back to bed, read awhile and fell asleep. He got up at 4:30 a.m. and

went to work at 5:00 a.m. at the cheese factory which he managed. He worked the entire day, returned home that evening, and started to prepare dinner. It was only after his son John discovered his mother in the basement that the defendant said he learned his wife had been killed. He denied killing her.

John, a high school student, testified that he went to sleep about 9:00 p.m. He awoke sometime between 2:00 a.m. and 3:00 a.m. when he heard a single dull or deadened scream by his mother coming from the basement recreation room. He testified he had never heard his mother scream like that before. He did not investigate because, he testified, it was none of his business, and if his mother was arguing with the defendant there might be a fight. He stayed awake for a few minutes and went back to sleep. He got up about 7:30 a.m. and left for school about 8:00 a.m.

John testified that when he came home from school the evening of November 17, his father asked him if he had heard his mother the previous night. John responded that he had not. John testified that the defendant told him that she had a "real doozie" when she came home. After the defendant learned from the police that John had heard a scream, the defendant asked John if it could have been noise from the ice machine in the refrigerator that he had heard rather than a scream. John responded that it was not the machine.

The defendant's testimony contains no reference whatsoever to a scream. The only sound the defendant testified he heard his wife make, coming from the basement recreation room at about the time John heard the scream, was a "retching noise, vomiting." The defendant stated that sound carried fairly easily from the recreation room in which Dorthy Wyss was killed to their bedroom and to John's bedroom because of a register running under the ceiling of the recreation room to those two bedrooms. He testified that "we used to always say,

why the hell did they put that damn thing in because every darn sound could be heard from that rec room."

The knife found partially beneath Dorthy Wyss' right arm was described by the defendant as his "favorite knife." Wyss testified that the last time he saw this knife was when he had left for the basketball game on the evening of the murder and that it was on the kitchen counter at that time. He stated that he had cleaned the kitchen at 2:20 a.m. and was certain the knife was not there. He also testified that he had checked the kitchen area again in the morning before he left for work "[a]nd if there was anything still out,—I turned the dishwasher on and went to work."

JoReen testified that she heard nothing after she went to bed the night of November 16. She awoke about 7:30 a.m. and left for school about 8:00 a.m.

The jury heard testimony that the neighbors living across the street had overheard numerous arguments between the Wysses, sometimes continuing until 3:00 or 4:00 in the morning. In March, 1981, Dorthy fled to her daughter's house several doors away, stating that if she "didn't get out he [the defendant] was gonna kill her." She spent the night in a local motel. In June, 1981, Dorthy told a psychiatrist whom she had been seeing professionally since January 30, 1981, that she was living in fear of her husband, that she felt trapped and resentful in her marriage and that something had to be done about it. After the murder, a deputy sheriff asked the defendant whether he had ever threatened his wife. He responded by saying, "I told her that if she didn't clean up her act, she would find her throat slit." The defendant, however, testified that he made this statement in reference to the danger Dorthy Wyss faced from her association with criminal drug dealers and was one of warning, not threat.

Another daughter of the defendant, Jackie Amble, testified that shortly after Dorthy Wyss' body was discovered and while Wyss was distraught, she heard him say, "Why did you get drunk? Why did you make me mad at you?" She testified that he "just kind of kept saying why, why."

When questioned by deputies regarding problems in his marriage, Wyss described himself as extremely jealous. He said that his wife liked to go out and be with people in bars and often would "flaunt this by bringing guys home. . . ." He told detective Lathrop that her running around and being gone bothered him. Lathrop testified that Wyss told him that if she was loud enough when she came home to the point where he was angered, he would get up and often it would lead to an argument between himself and Dorthy. Wyss told Lathrop that this occurred after one or both of them had been drinking. The defendant testified that "there would be arguments after she went uptown and got back in the evenings also."

Other facts pertinent to our conclusion that the evidence was sufficient to support the verdict appear later in this section.

The evidence in this case is entirely circumstantial. In order for this circumstantial evidence to meet the demanding "beyond a reasonable doubt" standard, the evidence must be sufficiently strong to exclude to a moral certainty every reasonable hypothesis of innocence. The defendant argues that there is a reasonable hypothesis that supports his innocence: the hypothesis that someone else killed his wife between the hours of 2:00 a.m. and 12:00 noon.

Because there is no suggestion in this record or in the defendant's argument that the "someone else" may have been the children, John or JoReen, the "someone else"

suggested by the defendant would have to have been an unknown intruder.

We find that a jury could reasonably conclude that the evidence was sufficiently strong to exclude to a moral certainty every reasonable hypothesis of innocence for a number of reasons. The motive Wyss suggests for his wife's murder i.e. the victim's alleged drug involvement, is not supported by the evidence or by the manner in which the murder was carried out. Even assuming some motive existed for someone other than Wyss to have murdered Dorthy, a jury could reasonably conclude that the hypothesis that an unknown intruder committed this murder in the three time frames in which it could have occurred has no basis in the record. Lastly, the physical evidence that the defendant points to as supporting his hypothesis is so speculative and so totally inconclusive that a jury could reasonably give it no weight. These reasons are more fully examined below.

## A. *Motive*

The defendant implies that Dorthy Wyss was involved with disreputable drug dealers and suggests this as a motive for her murder. Whatever the motive, the evidence strongly suggests, and a jury could reasonably conclude, that if there was an unknown intruder, he became motivated to kill Dorthy Wyss only after he entered the home. It cannot be seriously argued that an unknown intruder came into the house prepared to kill: a person bent on murder would have come much better prepared, and certainly would not have depended on a dull serrated knife to accomplish his planned murder.

Further, this hypothesis falls short because Wyss failed to demonstrate that drugs would have motivated an intruder to kill her after he entered the home. The extent, if any, of the victim's drug use or involvement with drug

dealers was never shown. Even if the defendant's statement with respect to a baggie of marijuana and some pills missing from the victim's purse is true, it cannot be seriously suggested that a desire to take these items prompted this murder, particularly in the manner in which the murder was carried out.

Even assuming a motive other than one relating to drugs existed for killing the victim (and there is none suggested in this record), a jury could reasonably find that it is unreasonable to believe that an unknown intruder would have entered the Wyss home without a plan of murder, would have become motivated to kill, and would have chosen, much less have found, this particular white handled steak knife with a dull blade of about 4½ inches long to accomplish his ends. The defendant himself testified that this knife was not on the counter when he had cleaned up the kitchen and put the dishes in the dishwasher at 2:20 a.m.

### B. *The three time frames in which this murder could have occurred*

Even assuming some motive existed for Dorthy Wyss' murder by someone other than Wyss, a jury could reasonably conclude that the hypothesis that an unknown intruder murdered Dorthy Wyss in the three time frames in which it would have to have occurred has no basis in this record. The pathologist testified that the murder occurred between 2:00 a.m. and 12:00 noon on November 17, 1981. The murder could not have occurred between 4:30 a.m. and 5:00 a.m. if the jury accepted the defendant's testimony that he got up at 4:30 a.m. and left for work at 5:00 a.m. because clearly he would have heard something. For the same reason, the murder also could not have occurred between 7:30 a.m. and 8:00 a.m. because that was the time the children got up and left for school.

Thus, in examining the defendant's hypothesis that an "unknown intruder" came into his house sometime between 2:00 a.m. and 12:00 noon and killed his wife, we must look at three time frames in which that hypothesis could have occurred: 1) Between 8:00 a.m. and 12:00 noon when no one other than Dorthy was home; 2) Between 5:00 a.m. and 7:30 a.m. when the children were asleep and the defendant was at work; and 3) Between 2:00 a.m. and 4:30 a.m. when everyone was home.

### 1. *Between 8:00 a.m. and 12:00 noon.*

The evidence strongly suggests and the jury could have reasonably concluded that Dorthy Wyss was dead before the children left for school at 8:00 a.m. The pathologist testified that the death was much more likely to have occurred between 2:00 a.m. and 6:00 a.m. than between 6:00 a.m. and noon.

That testimony is corroborated by two other pieces of evidence. Dorthy Wyss had a hair appointment for 8:30 a.m. that day. She had personally made that appointment at 4:00 p.m. the previous day. She had averaged 2–3 appointments a month at that hairdresser's shop since September of 1980. The hairdresser testified it was Dorthy Wyss' practice to be timely for her appointments. The hairdresser told Dorthy when she made the appointment the previous day that the 17th was her day off but that she would "come on my day off to do it for her" but that she would prefer to do it early in the day so she could have the rest of the day off. It is highly unlikely that Dorthy Wyss would have missed that appointment. The hairdresser also testified that when Dorthy Wyss failed to appear, she tried calling the Wyss home at 8:45 a.m. and twice more that morning but no one answered.

Beth Meyer, a receptionist at the Dean Clinic, testified that on the morning of November 17, she called the Wyss

home between 8:30 and 9:00 a.m. to set up an appointment. She received no answer. Thereafter she tried to telephone Dorthy Wyss' home at intervals of every 45 minutes to an hour until about 5:00 p.m. but received no answer.

We find that a jury could reasonably conclude that the evidence was sufficiently strong to exclude to a moral certainty the hypothesis that an unknown intruder killed Dorthy Wyss between the hours of 8:00 a.m. and 12:00 noon.

### 2. *Between 5:00 a.m. and 7:30 a.m.*

A jury could find it equally unreasonable to believe that an unknown intruder committed this murder between 5:00 a.m. and 7:30 a.m. while the children were asleep. Neither John nor JoReen heard a sound in the house during those early morning hours and were not awakened. The evidence strongly suggests this was a murder done in a raging frenzy. The victim's throat was slashed from ear to ear, there were 33 stab/cut wounds and 12–20 slash wounds; and there was an attempt made to separate the head from the body by sawing at the vertebra after the victim was already dead or within moments of being dead. The defensive wounds on Dorthy Wyss' hands indicate that she put up a struggle. In order for this murder to have occurred between 5:00 a.m. and 7:30 a.m., the intruder would have had to come into a strange house in a darkened and semi-darkened condition, search the house for Dorthy Wyss, become sufficiently motivated to kill her, search the house for the white-handled steak knife, kill her in a raging frenzy while she attempted to defend herself, *and have done all this without waking the children.*

We find that a jury could reasonably conclude that the evidence was sufficiently strong to exclude to a moral

certainty the hypothesis that an unknown intruder killed Dorthy Wyss between the hours of 5:00 a.m. and 7:30 a.m.

### 3. *Between 2:00 a.m. and 4:30 a.m.*

There is strong evidence from which the jury could reasonably conclude that this is the time frame in which Dorthy Wyss was killed. John Wyss testified he heard his mother scream some time between 2:00 a.m. and 3:00 a.m. It was a dull, deadened scream; he had never heard his mother scream like that before. The pathologist testified it was much more likely that the murder occurred between 2:00 a.m. and 6:00 a.m. rather than between 6:00 a.m. and 12:00 noon. Dorthy failed to keep a hair appointment at 8:30 a.m. The telephone was not answered that morning.

In order for an unknown intruder to have killed Dorthy Wyss between 2:00 a.m. and 4:30 a.m., the intruder would have had to enter a strange house at night in a darkened condition, search the house for Dorthy, become sufficiently motivated to kill her, search the house for the white-handled steak knife, kill her in a raging frenzy while she attempted to defend herself, *and have done all this without the defendant being aware of it.* The defendant himself testified that he was not sleeping well that night. He testified that sound carried fairly easily from the recreation room to his bedroom. The defendant testified that he got up a number of times during the night. He heard Dorthy Wyss vomiting. His testimony is silent with respect to any scream. That the defendant heard Dorthy Wyss vomiting but did not hear anything else is not believable. The defendant himself testified that "every darn sound could be heard from that rec room" in his bedroom. This murder occurred in the "rec" room. We find that a jury could reasonably con-

clude that the evidence was sufficiently strong to exclude to a moral certainty the hypothesis that an unknown intruder killed Dorthy Wyss between the hours of 2:00 a.m. and 4:30 a.m.

Lastly, in support of his hypothesis that an unknown intruder murdered his wife, Wyss emphasizes that no significant items of evidence implicate him. Further, he argues that certain pieces of physical evidence affirmatively indicate the presence of an unknown intruder. We find no merit in either argument.

The defendant emphasizes that no significant items of physical evidence implicate him. The State found no fingerprint or fingernail scrapings incriminating him. No bloodstains or spots were found on his person or clothing. Nevertheless, the jury had ample evidence before it to conclude, as they obviously did, that the defendant had time to clean himself at his home or his workplace and could have destroyed incriminating items of clothing he might have been wearing. The record does not indicate what, if any, bed clothes the defendant wore when he went to bed that night. If there were any clothes to destroy, the cheese factory maintained an incinerator which burned almost constantly and which was readily accessible to where the defendant parked his car.

The defendant points to certain pieces of evidence as supporting his theory that an unknown intruder killed Dorthy:

1) In his brief, defendant argues "[t]hey also found a bloody doorknob, leading to the basement from the garage. . . . Blood analyses determined that the blood on the doorknob was of human origin, but of an unidentified person." Although a reader might infer from the defendant's statement that the blood on the doorknob was from someone other than Dorthy Wyss or the defendant ("but of an unidentified person"), the record indicates that the lab technician was unable to type the blood at all due to

conditions beyond her control. Thus, although the blood was of human origin, it could have been anyone's including Dorthy Wyss' or the defendant's. (The doorknob in question was on the side of the door leading from the basement to the garage, not from the garage to the basement.)

2) The defendant also argues, in further support of his unknown intruder hypothesis, that "[h]airs were retrieved . . . from her right hand and from the coroner's body bag. Two hairs from the body bag and one hair from the victim's hand were not identifiable as being from the victim, the defendant or the two Wyss children living at home."

As to these two pieces of evidence, the record indicates the following:

a) Hairs from the victim's right hand: of the six hairs stuck to the hand of Dorthy Wyss from the blood, one hair was not consistent with that of the defendant or Dorthy Wyss; one hair was not suitable for comparison; four hairs were similar to the hair of Dorthy Wyss. By the word "similar," the Wisconsin State Crime Laboratory analyst indicated "hairs (that) are consistent in the microscopic characteristics observed, and therefore could have originated from a common source."

b) Hairs from the coroner's body bag: of the five hairs obtained from the body bag, the state crime laboratory analyst testified that one hair was similar to the defendant's hair; two hairs were not similar to that of the defendant, Dorthy Wyss, or of the two children; and, although the record does not state it with specificity, the remaining two hairs were similar to Dorthy Wyss' hair. ("There were some hairs that were similar in the general appearance with the—from the body bag with the standard [Dorthy Wyss'] head hair.")

The analyst testified that "[i]t's highly likely that you would find [hair from] people living within the house-

hold and anyone else that would have visited the house or come in contact with her." Thus, that a hair from a person who was not a member of the family was found stuck to Dorthy's hand, and that two hairs that fell from the body bag used to transport the victim's body to the morgue were not from a member of the family is totally inconclusive. No evidence showed that only the family used the recreation room. The victim was lying on the floor in a pool of blood. Any hairs previously left on the floor by visitors to the Wyss home could easily have attached themselves to her bloodied clothing or hand. This evidence, which the defendant points to in support of his unknown intruder theory, is so speculative and so inconclusive that a reasonable jury could give it no weight.

Given all of this evidence and the inferences to be drawn from it—the extremely jealous nature of the defendant, that fights between the defendant and his wife were frequently precipitated by drinking after she went uptown and got back in the evenings, his statement a year previous that someday she would find her throat slit, his distraught statements overheard by his daughter shortly after Dorthy's body was discovered, "Why did you get drunk? Why did you make me mad at you? . . . why, why"—we conclude that the evidence in this record is strong enough for a jury to exclude to a moral certainty every reasonable hypothesis of innocence.

## II. *Evidentiary Challenges*

The defendant argues that the trial court committed reversible error in evidentiary rulings which denied his motions *in limine.* The first ruling allowed Dorthy Wyss' psychiatrist to testify that Dorthy Wyss told him that she was living in fear of her husband and that she felt trapped and resentful in her marriage. The second ruling allowed a police officer who interrogated Wyss after

the murder to testify that Wyss told him that he was jealous when his wife socialized with other men. The third ruling allowed testimony regarding the defendant's statement to his wife that "if you don't clean-up your act, you may wind up with your throat slit."

In reviewing the trial court's evidentiary rulings, " '[t]he question on appeal is not whether this court, ruling initially on the admissibility of the evidence, would have permitted it to come in, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record.' " *State v. Alsteen*, 108 Wis. 2d 723, 727, 324 N.W.2d 426 (1982), *quoting State v. Wollman*, 86 Wis. 2d 459, 464, 273 N.W.2d 225 (1979). Thus, this court will not find an abuse of discretion if there is a reasonable basis for the trial court's determination. *Alsteen* at 727.

## A. Statement to Psychiatrist

Prior to trial, the defense filed a motion *in limine* to exclude testimony by Dr. Hann, a psychiatrist, who had treated Dorthy Wyss for smoking, weight loss and anxiety neurosis between January and June of 1981. The defendant contended that Dr. Hann's testimony regarding certain statements made by Dorthy Wyss would result in an unconstitutional denial of Wyss' right of confrontation. Dr. Hann's testimony was that Dorthy Wyss told him that she was living in fear of her husband and that she felt trapped and resentful in her marriage. The trial court denied this motion, finding that the statements to Dr. Hann were so "inherently trustworthy and reliable" as to overcome the confrontation issue.

The court of appeals concluded that the trial court did not abuse its discretion by admitting Dr. Hann's testimony. The court of appeals held that the primary purpose of the right to confrontation, to ensure that the trier

of fact has a satisfactory basis upon which to evaluate the truthfulness of the prior statement, was satisfied given that reliability inheres in Dorthy Wyss' statements to her doctor. *Dutton v. Evans*, 400 U.S. 74, 89 (1970), *quoting California v. Green*, 399 U.S. 149, 161 (1970). We agree.

In *State v. Bauer*, 109 Wis. 2d 204, 325 N.W.2d 857 (1982), this court detailed the controlling legal standard to be applied in resolving the confrontation issue which is presently before us. We stated:

"There are two requisites to satisfaction of the confrontation right [when hearsay evidence is admitteed]. First, the witness must be unavailable. Second, the evidence must bear some indicia of reliability. If the evidence fits within a firmly rooted hearsay exception, reliability can be inferred and the evidence is generally admissible. This inference of reliability does not, however, make the evidence admissible per se. The trial court must still examine the case to determine whether there are unusual circumstances which may warrant exclusion of the evidence. If the evidence does not fall within a firmly rooted hearsay exception, it can be admitted only upon a showing of particularized guarantees of trustworthiness." *Id.* at 215.

*See also Ohio v. Roberts*, 448 U.S. 56, 65–66 (1980).

Obviously the first requisite, unavailability, is satisfied in this case. The defendant argues, however, that the second requisite was not satisfied for two reasons: 1) the statements did not fall within a firmly rooted hearsay exception; and even if they did, 2) the statements were made under unusual circumstances which undercut their trustworthiness. We find that neither of these arguments has merit.

The trial court admitted the statement in question pursuant to sec. 908.03 (4), Stats., which codifies the long recognized hearsay exception for statements made for

purposes of diagnosis or treatment. This section pro-
vides:

"(4) STATEMENTS FOR PURPOSES OF MEDICAL DIAG-
NOSIS OR TREATMENT. Statements made for purposes of
medical diagnosis or treatment and describing medical
history, or past or present symptoms, pain or sensations,
or the inception or general character of the cause or ex-
ternal source thereof insofar as reasonably pertinent to
diagnosis or treatment."

The defendant contends, however, that the statements
cannot be deemed to fall within a "firmly rooted" hearsay
exception, as requird by *Bauer* and *Roberts,* because they
do not come within the traditional scope of that section.
According to the defendant, traditionally this section al-
lowed a doctor to relate a patient's report of present or
past symptoms only. *See* J. Weinstein and M. Berger,
4 *Weinstein's Evidence,* 803(4)[01] at 803-143 (1984).
In support of this argument, the defendant points to the
judicial council committee's notes—1974, which indicates
that sec. 908.03(4), constitutes a "major change in Wis-
consin law. . . ." W.S.A., Rules of Evidence, p. 467.
The committee notes indicate that this statute expanded
the traditional hearsay exception to permit a doctor to
relate "statements of the character or external source of
the cause" of the symptoms. Thus, according to the de-
fendant this expansion of the hearsay exception is sig-
nificant because it demonstrates that under the "firmly
rooted" hearsay exception Dr. Hann's testimony would
have been limited to recounting what Mrs. Wyss told him
of certain fears which brought about her anxiety, not
that the defendant was a causal factor in her anxiety.

We reject this argument and find that the question of
whether a hearsay exception is "firmly rooted" does not
turn upon how long the rule has been accepted but rather
how solidly it is grounded on considerations of reliabil-

ity and trustworthiness—the very reasons for the right to confrontation.

The rationale of the hearsay exception at issue here is clearly grounded on considerations of reliability and trustworthiness. Patients go to doctors to receive treatment and are thus strongly motivated to tell the truth. Weinstein and Berger, *supra* at 803–144–45 (1984). The Federal Advisory Committee's note to Rule 803(4), Federal Rules of Evidence, which is the federal counterpart of sec. 908.03(4), Stats., points out that the guarantee of trustworthiness "extends to statements as to causation" by a patient to a physician. *See Wisconsin Rules of Evidence,* 59 Wis. 2d at R266. We agree with the court of appeals' conclusion that "a patient's statement to a physician, made for purposes of diagnosis or treatment, as to the cause or source of a symptom, meets the requirement of reliability for confrontation purposes, in the absence of unusual circumstances." Thus, the hearsay exception under which Dr. Hann's testimony was admitted is "firmly rooted" within the meaning of *Bauer* and *Roberts.*

Our inquiry does not end here, however, because the defendant argues that Dorthy Wyss' statements to Dr. Hann were made under unusual circumstances which undercut their trustworthiness. Specifically, the defendant contends that Dorthy Wyss' statements were not reliable because: 1) she was being treated for emotional problems; 2) Dr. Hann had used hypnosis as part of his treatment of her and thus the statements may have been produced while under the influence of a hypnotic state; and 3) the evidence was actually evidence of bad character and was therefore unreliable as a matter of law.

We reject each of these contentions. First, according to Dr. Hann, Dorthy Wyss was not psychotic or delusional but was suffering from an anxiety disorder. Dr.

Hann testified that she "was always in touch with reality." Second, there was no evidence that Dorthy Wyss was in a hypnotic state at the time these statements were made. In fact, Dr. Hann testified that Dorthy Wyss had ten sessions with him from January 30, 1981, to June 12, 1981, but that he used a formal procedure to put her in a hypnotic state only once, during her first session on January 30, 1981. The statements at issue were made during the June 12, 1981, session and no hypnosis was used at that time. Accordingly, neither of these circumstances preclude reliability. Finally, we reject the defendant's argument that the unreliability of character evidence has any bearing on the trustworthiness of Dorthy's statements to Dr. Hann. We conclude, as did the court of appeals, that the defendant's argument confuses the issue of the reliability of Dorthy Wyss' statement to Dr. Hann with its inadmissibility on other grounds. That evidence of a person's character is excludable under sec. 904.04(1), Stats., does not make that evidence excludable in this instance, for it was admitted to show that Dorthy Wyss feared and resented her husband, regardless of his character.

We conclude that the trial court did not abuse its discretion in admitting Dorthy Wyss' statements to Dr. Hann. Accordingly, the defendant's constitutional right to confrontation was not violated by the admission of this evidence.

### B. Evidence of Defendant's Jealousy

In another motion in limine, the defendant sought to exclude evidence of certain statements made by Wyss during a police interrogation. In those statements Wyss described himself as jealous when his wife socialized with other men and indicated that Dorthy Wyss liked to

talk to people in bars and would often "flaunt this by bringing guys home."

The defendant argues that the trial court committed prejudicial error in admitting this testimony on the ground that it was evidence as to a trait of his character, inadmissible under sec. 904.04(1), Stats., which provides:

"904.04 Character evidence not admissible to prove conduct; exceptions; other crimes. (1) CHARACTER EVIDENCE GENERALLY. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion. . . ."

We conclude that the trial court did not abuse its discretion in admitting this evidence because the statements were an admission as to intent and motive, admissible under sec. 904.04(2). The statements were not admitted for the purpose of showing that the defendant acted in conformity with a particular character trait, but rather for the purpose of showing that he acted in conformity with a particular emotional state, jealousy, and that this provided a motive and intent for the crime. Therefore the evidence is not barred by sec. 904.04(1).

■

The defendant next contends that the trial court should have exercised its discretion and considered whether the probative value of the evidence outweighed its prejudicial effect. Section 904.03, Stats., provides:

"904.03 Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

However, the defendant failed to object to the admission of this evidence on the ground that its prejudicial effect outweighed its probative value. Consequently, the trial court was not required to engage in this balancing process before it admitted the evidence. *McClelland v. State,* 84 Wis. 2d 145, 157–58, 267 N.W.2d 843 (1978). Therefore, sec. 904.03, Stats., provides no basis for a claim of error.

### C. *Possible Threat*

The defendant, through another motion *in limine,* sought to exclude evidence of his statement to his wife that "if you don't clean up your act, you may wind up with your throat slit." The defendant argued that the statement was a reference to danger from Dorthy Wyss' association with criminal drug dealers and was one of warning that a drug associate would slit her throat. The trial court, while acknowledging that a strong argument could be made "that the statement was made in the context of her conduct and who she is hanging around with," ruled the testimony admissible. The trial court found that the testimony was "relevant because of the fact that it is such a highly coincidental circumstance, that that's in fact how she met her death." We hold that the court did not abuse its discretion in admitting this testimony.

The defendant argues that the evidence should have been excluded as irrelevant because the statement was not a prior threat by the defendant that he would kill his wife, but rather was a warning about her danger from associates. The defendant testified at trial that the statement was made during a discussion with his wife regarding drugs. The defendant's son-in-law, Lester Amble (Amble), testified that he heard the defendant tell his wife "that she should clean up her act, watch the

crowd that she hung with or she would find her throat slit." Amble testified that he did not take this statement to be a threat by the defendant that he would cut her throat. An officer who interrogated Wyss testified that he asked the defendant if he had ever threatened his wife. The defendant admitted that he had and volunteered that he told her that she would find her throat slit if she didn't clean up her act. Another officer testified that he heard this exchange.

We conclude that the jury could find from the officer's testimony that the defendant himself considered his statement a threat to his wife. Prior threats by an accused against a victim are relevant. *Simpson v. State,* 83 Wis. 2d 494, 511, 266 N.W.2d 270 (1978). Thus, we conclude that the trial court did not abuse its discretion in admitting the statement on grounds of relevancy.

The defendant also contends that the statement was too remote to have probative value. Remoteness is an aspect of relevancy. *State v. Sonnenberg,* 117 Wis. 2d 159, 167, 172, 344 N.W.2d 95 (1984). Amble testified that this statement was made in September or October of 1980, a little over a year before Dorthy Wyss' murder. The defendant testified that he had made the statement "a few months previously." We do not find that the statement was too remote in time to be relevant. Accordingly, we do not find that the trial court abused its discretion in admitting the testimony after concluding that it was not too remote in time.

### III. *Trial Court's Denial of the Defendant's Motion for Mistrial*

Following Wyss' conviction on July 27, 1982, it was learned that Brayshaw, the foreperson of the jury, was not a resident of Dane county. The defendant promptly

moved the circuit court for a mistrial and an order vacating the judgment. The defendant alleged that Brayshaw concealed that he was not a resident of Dane county at the time of Wyss' trial and that he failed to reveal his employment connection with the division of corrections. The defendant stated that defense counsel would have moved to strike Brayshaw for cause had these facts been known, and would have exercised a peremptory strike to remove him from the jury had that motion been denied. The defendant argued that the jury selection process was tainted by Brayshaw's failure to disclose this information, and thus, the defendant was denied his constitutional rights to due process and the effective assistance of counsel.

An evidentiary hearing was held on the defendant's motion at which time the following information was revealed. Brayshaw received a juror questionnaire in January of 1982, which was sent out to prospective jurors selected from the November, 1981, polling list. Brayshaw was living with his mother in Madison, Dane county, at the time he completed and returned the questionnaire. The form inquired about the juror's parentage and also asked whether the juror is married, single, divorced or widowed. Although Brayshaw is divorced, he marked the box indicating that he was single. Brayshaw drew a line through the question which asked about the ages of his children even though he had a nine-year-old son.

Shortly after returning this juror questionnaire, Brayshaw moved from Madison, Dane county to Beaver Dam, Dodge county. As part of the move, Brayshaw changed his employment and took a job as an electrician at the Waupun Correctional Institution in Waupun, Wisconsin.

Subsequently, Brayshaw was approved as qualified to serve as a juror and was summoned to appear, under penalty of law. It is undisputed that Brayshaw was not

asked, nor did he advise anyone, about whether he had moved from Dane county or changed his employment since he initially completed the juror questionnaire.

When asked why he checked the box indicating that he was single rather than divorced, Brayshaw indicated that he considered himself single as opposed to divorced. Brayshaw explained his failure to reveal the age of his son stating "[m]y prior life as long as it is legal and lawful is nobody's business."

During *voir dire*, the court asked whether any jurors were acquainted with law enforcement personnel. Brayshaw did not respond even though he was working at Waupun Correctional Institution and had daily, albeit negligible, contact with prison guards and had met with a police officer on several occasions concerning an allegation that he was involved in serious criminal activity. Brayshaw also failed to respond when the court asked whether any jurors were acquainted with the district attorney's office. Brayshaw did, however, have contact with the district attorney's office because of a problem with his child support payments.

Brayshaw testified that he failed to respond to the court's question about his acquaintance with law enforcement officers because he did not consider prison guards law enforcement personnel. He further testified that he did not indicate that he was acquainted with law enforcement officers even though he had had contact with a police officer because he thought that the word "acquainted" meant more than having had mere contact with someone. Brayshaw gave a similar response when asked about why he failed to indicate that he was acquainted with members of the district attorney's office. He also testified that he did not know that the individual he had had contact with regarding the child support matter was from the district attorney's office.

Following the evidentiary postconviction hearing on the defendant's motion, the trial court, in a memorandum decision, denied the defendant's motion for mistrial. The trial court found that Brayshaw was approved as qualified and was summoned to appear, under penalty of law. While Brayshaw neglected to advise anyone that he was no longer a resident of Dane county and that his employment had changed since he had completed the juror questionnaire, he was not asked to do so. In fact, no questions about residency were asked on *voir dire*. The trial court found that no governmental action was involved in denying Wyss a jury of the vicinage given that only Brayshaw knew that he no longer resided in Dane county. Thus, the trial court concluded that no constitutional deprivation occurred.

The trial court also determined that Brayshaw's misrepresentations on the jury questionnaire regarding his marital status, parentage and other background information did not reveal any bias against the defendant. The trial court stated that "given the facts subsequently disclosed, it is reasonable to believe that any prejudice by this juror would have been against the State, not against the defendant." The trial court concluded that there was no evidence that the verdict of the jury was the result of bias or prejudice.

As a general rule, the decision whether to grant or deny a motion for a new trial lies within the discretion of the trial court. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S. Ct. 845, 850 (1984). The trial court is in the best position to evaluate the relevance of undisclosed evidence or later discovered facts and to consider their impact on the outcome of the trial. *United States v. McMahan*, 744 F.2d 647, 652 (8th Cir. 1984). Thus, the trial court's determination on a motion for a new trial or relief from judgment because a juror

failed to fully disclose information during *voir dire* is reversible only for either an abuse of discretion or for a clear error of law in the exercise of its discretion. *McCoy v. Goldston*, 652 F.2d 654, 657 (6th Cir. 1981); *United States v. Vargas*, 606 F.2d 341, 344 (1st Cir. 1979). In this case, the court of appeals affirmed the trial court's denial of the defendant's motion for a mistrial.

### A. *Jury of the Vicinage*

The defendant asserts that his right under the sixth amendment of the United States Constitution, and the Wisconsin Constitution, art. I, sec. 7, to be tried entirely by residents of the county in which the crime occurred was violated because juror Brayshaw did not reside in Dane county when the case was tried. The trial court, as stated above, rejected this argument and concluded that no constitutional deprivation occurred.

The court of appeals declined to reach the issue of whether the sixth amendment's vicinage provision applies to the states. The court found, however, that Wisconsin Constitution art. I, sec. 7, does guarantee a defendant the right to a trial "by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law."[1] Despite the court of appeals' recognition of this constitutional right, it held, and we agree, that "the case law is firm: objections to the residency of a juror, even if based on constitutional grounds, are not

[1] The state argues that the right conferred under art. I, sec. 7, Wisconsin Constitution, is the right to a jury *drawn* from the county, not to a jury of persons who are county residents at the time of the trial. We do not reach this issue because whatever the merit of this argument, the result would not change in this case given that the defendant waived this right.

grounds for a new trial or reversal if made for the first time after the trial." We conclude that Wyss waived his right to a jury of the vicinage by failing to question Brayshaw during *voir dire* about his residency and then by failing to object to his serving on the jury on the ground that he was no longer a resident of Dane county.

In *Rockwell v. Elderkin*, 19 Wis. 388 (* 367) (1865), a civil case, the trial court granted a new trial based "on affidavits showing that one of the jurors had removed from said county [the county of the trial] to Dane County, and that this fact was not known to the defendant or his attorney, before the trial." *Id.* at 389 (* 367). This court reversed stating:

"The circumstance of *Elderkin* having discovered, after the trial, that one of the jurors had removed from the county, is not in our opinion sufficient cause for granting a new trial. If the objection had been taken before trial, by way of challenge, it might have prevailed on strictly technical grounds; but after trial we think is is too late. It is an objection which does not affect the impartiality or intelligence of the juror, and furnishes no presumption against the justice of the verdict. We think it should be disregarded after verdict." Id. at 390 (* 368).

The defendant contends that the court of appeals' reliance on *Rockwell* in finding waiver was both an error of law and an error of fact.

First, the defendant contends that *Rockwell* is not applicable here because, as a civil case, *Rockwell* was not subject to the heightened requirements of juror fairness and impartiality imposed upon criminal proceedings by the sixth amendment to the United States Constitution and by article I, sec. 7 of the Wisconsin Constitution. This argument was explicitly rejected in *Hickey v. State*, 12 Neb. 490, 11 N.W. 744, 745 (1882). In *Hickey*, a criminal case, the Nebraska Supreme Court invoking an earlier decision, *Wilcox v. Saunders*, 4 Neb. 581 (1876),

which relied on *Rockwell,* held that the failure to challenge the juror before he was sworn, when his nonresidency could have been ascertained upon proper inquiry on *voir dire,* constituted a waiver of the objection. The overwhelming weight of authority sustains this position even when a constitutional provision, such as the one the defendant relies upon, provides the defendant the right to a jury of the vicinage. *Accord State v. Powers,* 613 S.W.2d 955, 957 (Mo. Ct. App. 1981) ; *United States v. Haywood,* 452 F.2d 1330, 1332 (D.C. Cir. 1971) ; *United States v. Rosenstein,* 34 F.2d 630, 634 (2d Cir. 1929) ; *Herndon v. State,* 56 So. 85, 86 (Ala. App. 1911) ; *State v. Wainwright,* 376 P.2d 829, 831 (Kan. 1962) ; *State v. McCombs,* 181 P.2d 473, 474–76 (Kan. 1947) ; *State v. Olson,* 263 N.W. 437, 439 (Minn. 1935) ; *State v. Danner,* 226 P. 475, 476 (Mont. 1924) ; *Marino v. State,* 197 N.W. 396, 397–98 (Neb. 1924) ; *State v. Comes,* 268 N.W. 724, 726 (S.D. 1936) ; *Vaughn v. State,* 113 S.W.2d 895, 896 (Tex. 1938).

The defendant also argues that the court of appeals' reliance upon *Rockwell* was erroneous because the *Rockwell* court expressly premised its holding upon its finding that the juror's nonresidence furnished "no presumption against the justice of the verdict." *Rockwell* at 390 (\* 368). We find the same conclusion to be true in this case and thus disagree with the defendant's assertion that juror Brayshaw consciously misrepresented his county of residence. There is simply no evidence to that effect in the record. We accept the trial court's finding that the juror responded to a summons to appear, under penalty of law, and was never asked on *voir dire* about his residency. Thus, we too conclude that "no presumption against the justice of verdict" should be inferred from Brayshaw's nonresidence. *Id.*

## B. *Lack of Juror Candor*

On appeal to the court of appeals the defendant asserted that Brayshaw's false and misleading answers on *voir dire* and in a juror questionnaire prevented him from exercising his right to peremptorily challenge Brayshaw, and thus entitled him to a new trial for that reason. The court of appeals, rejecting this argument, adopted the rule enunciated in *McDonough Power Equipment*, a products liability case, as the rule to be employed in determining when a juror's failure to respond accurately to questions on *voir dire* entitles a party to a new trial.

The *McDonough* Court established a two-step test. The Court held that in order to obtain "a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equipment* at 850. The court of appeals, in applying this two-part test, assumed that Brayshaw dishonestly answered questions put to him and that the first part of *McDonough* test was satisfied.[2] However, the court of appeals concluded that the second step of the *McDonough* test was not satisfied. The court of appeals stated that "[n]either Brayshaw's marital status nor prison employment provided grounds to challenge him for cause under sec. 805.08(1), Stats." This section provides:

---

[2] The court of appeals did not determine whether the trial court's finding that Brayshaw responded honestly was clearly erroneous. It stated that for purposes of its opinion, it assumed otherwise.

"805.08 Jurors. (1) QUALIFICATIONS, EXAMINATION. The court shall examine on oath each person who is called as a juror to discover whether the juror is related by blood or marriage to any party or to any attorney appearing in the case, or has any financial interest in the case, or has expressed or formed any opinion, or is aware of any bias or prejudice in the case. If a juror is not indifferent in the case, the juror shall be excused."

We conclude that the court of appeals erred in adopting the *McDonough* two-part test in total as the rule to be applied in Wisconsin proceedings based on sec. 805.08(1), Stats.

In *McDonough*, Billy Greenwood and his parents sued McDonough Power Equipment, Incorporated to recover damages sustained by Billy when his feet came in contact with the blades of a riding lawn mower manufactured by McDonough. *McDonough Power Equipment* at 846. During the *voir dire*, the Greenwoods' attorney asked prospective jurors the following question:

" 'Now, how many of you have yourself or any members of your immediate family sustained any severe injury, not necessarily as severe as Billy, but sustained any injuries whether it was an accident at home, or on the farm or at work that resulted in any disability or prolonged pain and suffering, that is you or any members of your immediate family?' " *Id.* at 847.

Ronald Payton, who eventually became a juror, did not respond to this question. After a three week trial the jury found for McDonough. Subsequent to this verdict, the Greenwoods learned that juror Payton's son had been involved in a serious injury at one time, a fact which Payton had not revealed during *voir dire*. The Greenwoods moved the district court for permission to approach the members of jury and for a mistrial. The district court granted the Greenwoods permission to approach juror Payton regarding injuries allegedly sustained by his son but denied their motion for a new trial

without ever being informed of the results of the examination of Payton.

On appeal, the Tenth Circuit Court of Appeals held that juror Payton's silence had prejudiced the Greenwoods' right to exercise peremptory challenges and thus required a new trial. *Greenwood v. McDonough Power Equipment, Inc.*, 687 F.2d 338, 342 (10th Cir. 1982). On certiorari before the United States Supreme Court, the Greenwoods argued that the court of appeals correctly held that impairment of the right of peremptory challenge is reversible error without a showing of prejudice. They maintained that the "good faith" of the nondisclosure and the "actual bias" of the juror are completely irrelevant to the determination of impairment of peremptory challenge. Defendant Wyss raised this same argument in his appeal before the court of appeals.

The United States Supreme Court rejected this argument without fully explaining its rationale. The Court simply stated:

"A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination." *McDonough Power Equipment* at 850.

We conclude that such a rejection is correct given that peremptory challenges have not acquired a constitutional footing. Thus, we decline to adopt the approach urged by Wyss before the court of appeals which would require a new trial to be granted whenever a party's right of peremptory challenge has been impaired.

The United States Supreme Court in *Swain v. Alabama*, 380 U.S. 202, 219 (1965), recognized the importance of peremptory challenges stating:

"Although '[t]here is nothing in the Constitution of the United States which requires the Congress [or the States] to grant peremptory challenges,' *Stilson v. United States*, 250 U.S. 583, 586, nonetheless the challenge is 'one of the most important of the rights secured to the accused,' *Pointer v. United States*, 151 U.S. 396, 408. The denial or impairment of the right is reversible error without a showing of prejudice, *Lewis v. United States, supra; Harrison v. United States*, 163 U.S. 140; cf. *Gulf, Colorado & Santa Fe R. Co. v. Shane*, 157 U.S. 348. 'For it is, as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose.' *Lewis v. United States, supra,* at 378." *Swain*, 380 U.S. at 219.

There is little doubt that if the trial court or the prosecution had deprived Wyss of his right to the effective exercise of his peremptory challenges it would have provided grounds for a new trial. *Vargas*, 606 F.2d at 346, *citing Harrison v. United States*, 163 U.S. 140 (1896), *Gulf, Colorado & Santa Fe R. Co. v. Shane*, 157 U.S. 348 (1895), and *Lewis v. United States*, 146 U.S. 370 (1892). But such is not the situation here. Neither the trial court nor the prosecution deprived the defendant of his right to the effective exercise of his peremptory challenges. There is no suggestion here that either the court or prosecution knew or should have known of juror Brayshaw's marital status, parentage, employment, or acquaintance with law enforcement personnel or the district attorney's office. It was juror Brayshaw's answers and lack of answers that caused this problem and abridged the defendant's right to intelligently exercise his peremptory challenges.

The defendant argues that since the prejudice and harm to him are no less when it is a juror, rather than the court or prosecution, that deprives him of his effective exercise of his peremptory challenge, the result should be the same: a new trial. We disagree. To adopt a per se rule and grant a new trial to a defendant in

every instance in which a juror on *voir dire* answers a question dishonestly, would be to place a strain on the judicial system it could not long endure. As the *McDonough* Court noted:

"Trials are costly, not only for the parties, but also for the jurors performing their civic duty and for society which pays the judges and support personnel who manage the trials. It seems doubtful that our judicial system would have the resources to provide litigants with perfect trials, were they possible, and still keep abreast of its constantly increasing case load." *McDonough Power Equipment* at 848.

Accordingly, we find, as did the *Vargas* court, that:

"If the juror had answered the questions fully he, undoubtedly, would have been subjected to more intensive interrogation by the court and the full facts disclosed. We do not treat lightly the concealment of information by a prospective juror, but the jury system, despite its vital role in our jurisprudence, is not perfect. It is based on the assumption that a person's guilt or innocence can best be determined by twelve persons representing a fair cross section of the community. We try to eliminate bias and prejudice by juror questionnaires and voir dire examination. There is no way, however, of absolutely insuring that a prospective juror will answer honestly the questions put to him. The secrecy within which juror's deliberations are necessarily cloaked prevents us, in most cases from ever finding out the reasons and motivations for a verdict. *When an individual betrays his trust, the only recourse is to try to determine, as was done here, whether there was such a showing of bias or prejudice as to require a new trial. This protects, insofar as is humanly possible, the integrity of the jury trial.* A new trial would be a windfall for a defendant, but it would have no prophylactic or deterrent effect on prospective jurors." *United States v. Vargas,* 606 F.2d at 346. (Emphasis added.)

Thus, we conclude that the proper focus of inquiry when ruling on a motion for a new trial in this situation is whether the juror was biased against the litigant.

In spite of our agreement with the *McDonough* Court's rejection of the argument that a new trial is mandated whenever a juror's nondisclosure or concealment interferes with a party's intelligent exercise of peremptory strikes, we decline to adopt the *McDonough* two part test as the rule to be followed in Wisconsin criminal proceedings. The *McDonough* Court held:

"To invalidate the result of a three-week trial because of a juror's mistaken, though honest response to a question, is to insist on something closer to perfection than our judicial system can be expected to give. . . . We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equipment* at 850.

We conclude that the better rule is that in order to be awarded a new trial, a litigant must demonstrate: (1) that the juror incorrectly or incompletely responded to a material question on *voir dire;* and if so, (2) that it is more probable than not that under the facts and circumstances surrounding the particular case, the juror was biased against the moving party. *See, e.g., McCoy,* 652 F.2d at 659.

The problem with the first step in the *McDonough* test is that an honest answer forecloses *any* further inquiry into the area of potential juror bias. We believe, as did five members of the United States Supreme Court as expressed in the concurring opinions of Justice Blackmun, with whom Justices Stevens and O'Connor joined, and Justice Brennan, with whom Justice Marshall joined, that the first part of the test does not adequately protect parties who may be prejudiced by other than dishonest answers. An honest answer may nevertheless be ob-

jectively incorrect. A technically correct answer may nevertheless be incomplete. We conclude that an honest answer, if it is objectively incorrect or incomplete, should not preclude the moving party from making further inquiry with respect to juror bias. As one court has stated:

"Although a defendant has a right to have questions answered truthfully by prospective jurors, the failure of a juror to make a proper response to a question regarding his qualifications does not automatically entitle a defendant to a new trial. The proper inquiry by this court in such cases is whether the appellant's rights were prejudiced by the juror's failure to respond properly. *Beauregard v. State,* Ala. Cr. App., 372 So. 2d 37 (1979), cert. denied, Ala., 372 So. 2d 44, and cases cited therein. In *Freeman v. Hall,* 286 Ala. 161, 238 So. 2d 330 (1970), our supreme court stated:
" '*We hold that the proper inquiry for the trial court on motion for new trial, grounded on allegedly improper responses or lack of responses by prospective jurors on voir dire, is whether this has resulted in probable prejudice to the movant.* This appears to be the general rule throughout the country. . . ." *Bufford v. State,* 382 So. 2d 1162, 1172, (Ala. Cr. App. 1980). (Emphasis added.)

*Accord United States v. Vargas,* 606 F.2d at 344. (The established rule is that the party seeking the new trial because of nondisclosure by a juror must prove bias or prejudice.) ; *State v. Scruggs,* 551 S.W.2d 306, 308 (Mo. App. 1977). (The chief consideration in determining whether a mistrial should be granted is whether the defendant was prejudiced.)

We therefore depart from the first part of the *Mc-Donough* test which denies inquiry into the area of potential juror bias whenever a prospective juror provides an honest answer to the question posed. It is too limited. A subjectively honest answer may well be objectively incorrect. A person may believe, given the

vagueness and ambiguities inherent in language and the intelligence and education of that person, that he or she is giving an honest answer, yet that answer may be objectively incorrect. *See McDonough Power Equipment* at 849 ("jurors are not necessarily experts in English usage."). Furthermore, a person could answer a question with a response that is technically correct, but which is objectively incomplete. An incomplete answer might conceal vital information pertaining to the potential bias of a prospective juror. The correct or complete answer could suggest, in a given case, that the individual would be a biased juror. Thus, we cannot agree with the *McDonough* Court that a new trial is never warranted whenever a prospective juror provides an honest answer to the question posed. We find that the better approach is to allow a movant to reach the issue of juror bias whenever the court determines that a juror has given an incorrect or incomplete answer to a material question on *voir dire*.

As to the second part of the test, the *McDonough* Court held that in order to obtain a new trial, the party must show that had the juror given a correct response to a question asked on *voir dire,* a valid basis for a challenge for cause would be demonstrated. If we accept this express language of *McDonough,* we are concerned that it could be read entirely too narrowly. This concern was implicitly recognized by Justice Blackmun in his concurrence, joined by Justices Stevens and O'Connor. A narrow reading of the *McDonough* language ("and then further show that a correct response would have provided a valid basis for a challenge for cause.") suggests that the correct response in and of itself must demonstrate the basis for a challenge for cause.

The harshness of this approach can be easily demonstrated. Take for example a personal injury case where all prospective jurors are asked if they have any chil-

dren. A juror who has a child fails to respond, but not only does she have a child, but her child had recently been badly injured in an automobile accident. If a litigant sought to have a new trial ordered once having learned of the juror's incorrect answer, that litigant would not prevail if the language of the *McDonough* opinion was applied narrowly. A correct answer on *voir dire* would have been that the prospective juror did have a child. However, applying the *McDonough* language literally, this correct answer would not prove to be sufficient to provide a basis to strike this juror for cause. The correct answer ("yes, I have a child") would not in and of itself provide a basis for a challenge for cause. However, if further inquiry were allowed, it would reveal that not only did she have a child, but that that child had been seriously injured in an automobile accident and, possibly that she harbored antagonistic feelings against drivers of automobiles who caused accidents and insurance companies that contested benefits. A complete inquiry would have revealed that the prospective juror was sufficiently biased to provide a valid basis for a challenge for cause. Thus, we conclude that a narrow reading of *McDonough* fails to take into account the very real possibility that a correct and/or complete answer, although not providing a basis for challenge itself, may well provide the basis for further questions and responses that do uncover bias. Therefore, we conclude as did Justice Blackmun in his concurring opinion, that:

"Thus, regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred. See *Smith v. Phillips*, 455 U.S. 209, 215–216, 102 S. Ct. 940, 944–945, 71 L. Ed. 2d 78 (1982); *id.*, at 221–224, 102 S. Ct., at 948–949 (O'CONNOR, J., concurring)." *Mc-*

*Donough Power Equipment* at 850. (Blackmun, J., concurring.)

If, at the posttrial hearing, the movant can show that the juror did respond incorrectly or incompletely to a question, the movant must then be afforded the opportunity to demonstrate bias regardless of whether a correct response to a question asked on *voir dire* would in and of itself have provided a valid basis for a challenge for cause.

In applying this second standard, a trial court should recognize that the bias of a prospective juror may be actual or implied. *See* sec. 805.08, Stats. That statute provides a challenge for cause if there is actual bias, i.e., if the prospective juror "has expressed or formed any opinion, or is aware of any bias or prejudice in the case." The statute also provides a challenge for cause if there is implied bias, and sets forth specific grounds that will automatically disqualify prospective jurors without regard to whether that person is actually biased, i.e., if "the juror is related by blood or marriage to any party or to any attorney appearing in this case, or has a financial interest in the case."

Bias may be inferred from surrounding facts and circumstances. The trial court must be satisfied that it is more probable than not that the juror was biased against the litigant. *See* e.g., *McCoy,* 652 F.2d at 659. Whether a juror answered a particular question on *voir dire* honestly or dishonestly, or whether an inaccurate or incomplete answer was inadvertent or intentional, are factors to be considered in determining whether the juror was biased. *Id. See Burkett v. State,* 319 A.2d 845, 848–49 (Md. 1974) ; *People v. Espinoza,* 669 P.2d 142, 144 (Col. App. 1983) ; *United States v. Moss,* 591 F.2d 428, 438 (8th Cir. 1979). Thus, a material nondisclosure by a juror resulting from a purposefully incorrect answer, a

deliberate concealment or other mendacious conduct may be sufficient by itself or under the totality of circumstances for a court to find bias. If the court considers the prospective juror's answers on *voir dire* in its ultimate determination of bias, the court should consider the following factors:

(1) did the question asked sufficiently inquire into the subject matter to be disclosed by the juror;

(2) were the responses of other jurors to the same question sufficient to put a reasonable person on notice that an answer was required;

(3) did the juror become aware of his or her false or misleading answers at anytime during the trial and fail to notify the trial court? *McCoy,* 652 F.2d at 659.

We turn now to the questions before this court, based on the standard we have enunciated: 1) whether juror Brayshaw incorrectly or incompletely responded to a material question on *voir dire* and, if so, 2) is it more probable than not that juror Brayshaw, under the facts and circumstances surrounding this particular case, was biased against Elmer Wyss.

We find that juror Brayshaw incompletely responded to material questions in his juror questionnaire and on *voir dire.* In response to the question about marital status, Brayshaw checked the box indicating that he was single, whereas a complete answer to this question would have indicated that he had been divorced. Brayshaw also neglected to reveal that he had a son. During *voir dire,* juror Brayshaw failed to correctly answer questions regarding his acquaintance with law enforcement personnel and his contact with the district attorney's office. We conclude that the first part of the two part test is established: juror Brayshaw incorrectly and incompletely responded to material questions on *voir dire.*

We conclude, however, that the second part of our two part test has not been met. In this case, the trial

court determined that under the facts and circumstances surrounding this particular case, juror Brayshaw was not biased or prejudiced against the defendant. The trial court stated:

> "To suggest that the non-disclosures by the juror prejudiced the defendant is to speculate. It could be argued that each of the non-disclosures could have shown a pre-disposition against the State.
>
> "In point of fact, on this record, I cannot find that the juror was prejudiced one way or the other. I find that his verdict, like those of the other eleven jurors, was based upon the evidence."

We accept the findings of the trial court, and conclude that the trial court's determination in this regard was not clearly erroneous. There is no showing in this record that Brayshaw was actually biased against the defendant. Nor are there any facts and circumstances demonstrated from which bias may be inferred. There is simply no evidence in this record which demonstrates that juror Brayshaw's incorrect or incomplete answers were the result of bias. Nor is there any indication that juror Brayshaw intentionally tried to conceal information or purposefully gave an incorrect answer. Thus, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for mistrial.

## IV. *Discretionary Reversal in the Interest of Justice*

The court of appeals, finding no merit in any of the defendant's claims of error, nevertheless granted the defendant a new trial in the interest of justice, pursuant to sec. 752.35, Stats. The court of appeals determined that justice had miscarried in the proceedings below. The court of appeals based its finding upon the joint

effect of two factors: (1) the "closeness of the case"; and (2) the likelihood that juror Brayshaw "would have been excused or struck from the jury had he more candidly answered the trial court's questions on *voir dire*."[3]

The court of appeals in reaching this result stated that many cases indicated that a new trial may not be granted unless it appears that a retrial under optimum circumstances will result in an acquittal. Nonetheless, the court of appeals did not make a determination to that effect in granting discretionary reversal.

The State argues that the court of appeals erred as a matter of law when it granted a new trial in the interest of justice without first concluding that there was a substantial degree of probability that a different result would be produced at a new trial. We agree.

In *State v. McConnohie,* 113 Wis. 2d 362, 334 N.W.2d 903 (1983), this court discussed the standard of review appropriate for assessing the correctness of the court of appeals' grant of a new trial under sec. 752.35, Stats. We stated that we ordinarily decline to review any discretionary order of the court of appeals when it is based upon a proper view of the law. *McConnohie* at 369. We stated that "[p]articularly, this court will refrain from reviewing court of appeals decisions made in the interest of justice, for there is no assumption by this court that its determinations are necessarily more just than those of the court of appeals." *Id.* at 368. Once having accepted review of the court of appeals' grant of a new trial in the interest of justice, we must uphold the court's discretion if its decision is made on appropriate facts and

---

[3] The defendant did not raise either the closeness of the case or the lack of juror candor in urging the court of appeals to grant discretionary reversal. Rather, it based its argument upon claimed prosecutorial excesses. The court of appeals determined that the claimed excesses did not occur.

the correct law and thus is one which a court reasonably could have reached. *Id.* at 370.

However, we have never hesitated to reverse discretionary determinations where the exercise of discretion is based on an error of law. *Id.* at 371; *First Wis. Nat. Bank of Oshkosh v. KSW Inv.*, 71 Wis. 2d 359, 364, 238 N.W.2d 123 (1976). As this court has stated in *State v. Hutnik*, 39 Wis. 2d 754, 763, 159 N.W. 2d 733 (1968), "[i]f a judge bases the exercise of his discretion upon an error of law, his conduct is beyond the limits of discretion." *See also State ex rel. Schulter v. Roraff*, 39 Wis. 2d 342, 349–50, 159 N.W.2d 25 (1968). Thus, if the court of appeals makes an error of law in exercising its discretion, pursuant to sec. 752.35, Stats., it has committed an abuse of its discretion. In the instant case, we conclude that the court of appeals erred, as a matter of law, when it granted a new trial in the interest of justice without first determining whether there was a substantial degree of probability that a new trial would produce a different result.

Section 752.35, Stats., provides the court of appeals with two bases upon which to grant a discretionary reversal. This section provides:

"**Discretionary reversal.** In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendment in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

Thus, a new trial may be ordered in either of two ways: (1) whenever the real controversy has not been fully tried or (2) whenever it is probable that justice has for any reason miscarried. Separate criteria exists for determining each of these two distinct situations.

The court of appeals may exercise its power of discretionary reversal under the first part of sec. 752.35, Stats., without finding the probability of a different result on retrial when it concludes that the real controversy has not been fully tried. *See, e.g., State v. Cuyler,* 110 Wis. 2d 133, 142–43, 327 N.W.2d 662 (1983); *Garcia v. State,* 73 Wis. 2d 651, 245 N.W.2d 654 (1976); *Logan v. State,* 43 Wis. 2d 128, 137, 168 N.W. 2d 171 (1969); *Lorenz v. Wolff,* 45 Wis. 2d 407, 173 N.W.2d 129 (1970). The case law reveals that situations in which the controversy may not have been fully tried have arisen in two factually distinct ways: (1) when the jury was erroneously not given the opportunity to hear important testimony that bore on an important issue of the case, *e.g., Cuyler, Garcia* and *Logan;* and (2) when the jury had before it evidence not properly admitted which so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried. *E.g. Lorenz.*

In either of these situations, the court is not confined to apply the mechanistic formula articulated in *Lock v. State,* 31 Wis. 2d 110, 142 N.W.2d 183 (1966), which required it to find a substantial probability of a different result on retrial. *Lorenz* at 414. As we have previously noted in such situations, "it is apparent that we cannot say, using the mechanistic rule of *Savina* [which restated the *Lock* rule], that on a retrial the [petitioning party] plaintiff would probably win." *Lorenz* at 415. Thus, the court must have the liberty in such situations to consider the totality of circumstances and determine whether a new trial is required to accomplish the ends of justice

because the real controversy has not been fully tried. *Cuyler* at 142; *Lorenz* at 415.

The grounds for ordering a new trial under the second part of sec. 752.35, Stats., when it is probable that justice has miscarried, have not changed since they first appeared in sec. 2405m, Stats. 1913 created by ch. 214, Laws of 1913. From the time of the statutes' inception until *Lock*, no bright line rule was articulated for determining when justice had miscarried in an individual case. However, prior to *Lock*, cases involving a reversal because of a miscarriage of justice had implicitly complied with the standard that the probability of a different result had to be established before a new trial would be ordered. *See Paladino v. State*, 187 Wis. 605, 606, 205 N.W. 320 (1925); *State v. Hintz*, 200 Wis. 636, 642, 229 N.W.54 (1930). *Lock* unequivocally established the rule to be followed for determining when a miscarriage of justice, under the second part of sec. 752.35, Stats., has occurred. We stated: "In order for this court to exercise its discretion and for such a probability to exist we would at least have to be convinced that *the defendant should not have been found guilty* and that justice demands the defendant be given another trial." *Id.* at 118. (Emphasis added.)

This requirement has been reiterated repeatedly and has become a firm fixture in Wisconsin criminal law. For the most recent cases restating the *Lock* rule *see State v. Ruiz*, 118 Wis. 2d 177, 200, 347 N.W.2d 352 (1984); *Cuyler*, at 142; *Roe v. State*, 95 Wis. 2d 226, 242–43, 290 N.W.2d 291 (1980); *Frankovis* at 152; *Rogers v. State*, 93 Wis. 2d 682, 694, 287 N.W.2d 774, (1980). Consistent with this requirement, this court has denied a defendant a reversal in the interest of justice on numerous occasions because it could not conclude that a new trial would produce a different result. *See, e.g., Haskins v. State*, 97 Wis. 2d 408, 425, 294

N.W.2d 25 (1980); *Neely* at 55; *Frankovis* at 152; *Boyer v. State,* 91 Wis. 2d 647, 284 N.W.2d 30 (1979).

In the instant case the court of appeals determined, and we agree, that the record contains no suggestion that the real controversy has not been fully tried. Thus, the appropriate law to be applied in the instant case is the *Lock* rule. However, both the State and the defendant agree that the court of appeals, though not explicitly, relied upon *Lorenz* when it considered the totality of circumstances in ordering a new trial in this matter.

If the court of appeals did in fact implicitly rely on *Lorenz*, as both parties agree, that reliance was inappropriate. In *Lorenz* this court dealt with the situation when a reviewing court may order discretionary reversal under the first part of sec. 752.35, Stats., when the real controversy has not been fully tried.

In *Lorenz*, the plaintiff was injured in an automobile accident when the car he was driving was struck from behind by defendant Wolff's vehicle. Lorenz testified that after several weeks of minor complaints following the accident, he developed a terrific headache and went blind in his left eye. He also developed partial paralysis of his right side and was disabled and unable to work as a result. A neurosurgeon diagnosed Lorenz's problem as a berry aneurysm.

The basic issue that was to be decided at trial was whether the aneurysm was caused by the accident or whether the accident aggravated a pre-existing aneurysm. *Lorenz* at 411. There was evidence presented at trial by competent medical witnesses that the aneurysm and the subsequent disability were the result of the automobile accident. Other physicians testified to the contrary view. *Id.* at 412–13. Critical to the jury's determination on this issue was the credibility of the plaintiff as to the nature of his complaints when they arose.

The essence of the defendant's case was that Lorenz did not have severe headaches, or if he did, that they predated the accident, and that his disability was not as severe as he contended it was. *Id.* at 415. Defense counsel repeatedly interjected his own observations that Lorenz was not disabled because defense counsel and his son claimed they saw Lorenz engaging in certain physical activity. As this court stated, "[t]he vice of this testimony is that [the attorney's] own observations were not properly in evidence and he, by clear implication, attempted to measure the credibility of Lorenz against his own reputation for truth and veracity." *Id.* at 425.

This court, in granting a new trial in the interest of justice, concluded that the jury had before it evidence that was not properly admitted in the trial. *Id.* at 426. This court found that the jury was unable to impartially and unprejudicially evaluate the truth and veracity of plaintiff Lorenz because defense counsel consistently indulged in improper and prejudicial conduct during the course of the trial. *Id.* at 414. Such an evaluation by the jury was critical because Lorenz's credibility was a crucial aspect of his case. Thus, this court concluded that the real controversy was not fully tried because "the circumstances of the trial prevented a fair trial of the factual issues of the case." *Id.* at 426.

In granting a new trial this court was unable to say, given that the causal relationship between the blindness and paralysis was hotly disputed, that Lorenz would probably win on retrial. *Id.* at 415. Neither was this court able to make such a determination in *Cuyler*, *Garcia* or *Logan*. In each of these criminal cases, this court reversed the trial court's judgments of conviction and granted new trials because the real controversy had not been fully tried. The major issue is each of these cases was the credibility of the defendants.

The jury was not given the opportunity to hear relevant and important testimony that bore on that issue.

It is sound policy for this court not to impose a requirement upon reviewing courts to find that a different result on retrial is probable when the ground for discretionary reversal is that the real controversy has not been fully tried. Normally, a reviewing court will be unable to predict what the probable outcome will be on retrial when the real controversy was not tried or was so sidetracked and clouded that it may accurately be said that it was not fully tried. Such is not the case, however, when the ground for discretionary reversal is under the second part of sec. 752.53, Stats., i.e. that it is probable that justice has miscarried. Thus, we conclude that if the court of appeals did in fact rely on *Lorenz* in reaching its result, that reliance was misplaced.

The court of appeals concluded that the *Lock* rule was not applicable to the instant case because this case in addition to being what it labeled a "close one," also involved inaccurate responses by juror Brayshaw regarding his qualifications. Accordingly, the court of appeals relied on *Maahs v. Schultz*, 207 Wis. 624, 242 N.W. 195 (1932), to permit reversal in the interest of justice because of alleged inaccurate response by a juror regarding his qualifications, without any finding that a new trial would produce a different result. The court stated: "*Maahs v. Schultz*, 207 Wis. 624, 242 N.W. 195 (1932), establishes that even though the evidence sustains the verdict, the fact that a juror gave inaccurate responses regarding his qualifications when the jury was picked, can be a ground for a discretionary reversal and a new trial." We conclude that the court of appeals' reliance on *Maahs* is misplaced for several reasons.

First, the *Maahs* court did not reverse in the interest of justice merely because of its concern about a juror's

inaccurate responses regarding his qualifications. The court expressed grave concerns about the juror's partiality. The court stated:

"This testimony concerning Fuhrman's knowledge of the case was not easy to obtain, and it was only after diligent effort on the part of defendant's attorney that he was able to make this showing bearing upon the qualifications of juror Fuhrman. This evidence leaves upon our minds the distinct impression that the juror Fuhrman knew more about this case than he revealed, and leaves the suspicion that he suppressed his knowledge of the case for some purpose." *Id.* at 637.

Second, the court was also concerned about the failure of the trial court to give the proper jury instructions as to negligence. This court stated:

"While we are reluctant to hold that question 1 as framed, and the instructions given upon that question, constitute reversible error, we are satisfied that the jury would have had a much clearer conception of their duty if the question had contained the expression 'the controlling cause' instead of 'a controlling cause.' We are also satisfied that the requested instructions of the defendant, or some of them, if given, would have been beneficial to the understanding of the jury of the matters submitted to them." *Id.* at 638.

Finally, the *Maahs* court stated that: "[a] perusal of the record leaves us with very grave doubts as to the justice of the verdict rendered in this case." *Id.* We conclude that this determination was the functional equivalent of stating that the verdict in this case was incorrect and that a new trial would produce a different result. It was not until *Lock*, which came subsequent to *Maahs*, that such a determination was explicitly articulated.

We conclude that neither the *Maahs* nor the *Lorenz* rule is applicable in determining whether justice has

miscarried under the second prong of sec. 752.35, Stats.; the *Lock* rule must be followed in such a situation. Thus, the court of appeals erred as a matter of law in granting a new trial in the interest of justice without determining to a substantial degree of probability that a different result was likely to be produced on retrial.

Having determined that the court of appeals erred as a matter of law in exercising its discretion, we conclude that the court of appeals' order exceeded the limits of its discretion. *First Wis. Nat. Bank of Oshkosh* at 364 *quoting Hutnik* at 763. Therefore its discretionary determination is void and reversal is required.

■■

This court has the power, pursuant to sec. 751.06, Stats., set forth below,[4] to consider the propriety of granting a discretionary reversal in this case. We conclude that it is appropriate to exercise our power of discretionary review, pursuant to this statute, rather than remanding this case to the court of appeals for the correct application of the law. While the *McConnohie* court noted that this court will not ordinarily exercise its discretion under sec. 751.06 where either the trial court or the court of appeals has first exercised its discretion to grant a new trial, we find that it is appropriate to do so in this case for several reasons. *McConnohie* at 370. First, as we have already stated, in ap-

---

[4] "751.06 Discretionary reversal. In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

plying an incorrect legal standard, the court of appeals' exercise of discretion is void. Thus we do not treat this case the same as we would treat cases in which the trial court or court of appeals actually exercised its discretion. Second, the defendant has specifically stated that "this court would be correct in entering its own grant of a new trial pursuant to sec. 751.06, Wis. Stat.," and has fully briefed and argued this issue for our review. Finally, we believe that the interests of judicial economy, reduced costs to the litigants, speedy resolution of appeals and finality of decisions are best served by this court considering the propriety of granting a discretionary reversal in this case. We have fully considered the issues raised by the parties and have carefully examined the rather lengthy record in this case. We therefore conclude that remanding this case to the court of appeals is not a good use of judicial resources for doing so would necessitate duplicative efforts.

We conclude that when the correct legal standard is applied, neither the alleged closeness of the case nor the lack of juror candor alone or in combination are sufficient to lead to the conclusion that justice has miscarried in this case. We simply can not conclude to a substantial degree of probability that a new trial would produce a different result in this case. To the contrary we believe that "[t]his is not a case where . . . the defendant 'should not have been found guilty.' " *Rogers* at 694, *quoting Berg v. State,* 41 Wis. 2d 729, 746, 165 N.W.2d 189 (1969). We believe the evidence is more than sufficient to dispel any doubt regarding the defendant's guilt.

As we stated earlier in this opinion, the evidence in this case was strong enough to exclude to a moral certainty every reasonable hypothesis of the defendant's

innocence. Contrary to the court of appeals' finding that this was a close case, we conclude that the evidence in this case was overwhelming. We also conclude that while juror Brayshaw's lack of candor may have interfered with the defendant's right to intelligently exercise a peremptory challenge, there is no indication in the record that Brayshaw was anything but impartial. The trial court made an express finding that juror Brayshaw did not have any bias or prejudice against defendant Wyss. Thus there is simply no indication that an incorrect result was reached in this case. Accordingly, we reverse this portion of the court of appeals and reinstate the judgment of conviction.

*By the Court.*—Decision of the court of appeals is reversed and judgment of conviction is reinstated.

WILLIAM G. CALLOW, J. (concurring). I concur with the result and reasoning of the majority opinion. I write separately to address the dissent's discussion of the classes of cases in which discretionary reversal may be granted.

The majority opinion discusses the two instances, as set forth in the statute and in case law, in which discretionary reversal is appropriate. They are: (1) whenever the real controversy has not been fully tried or (2) whenever it is probable that justice has for any reason miscarried. Page 735. The dissent seeks to create a third category of cases in which discretionary reversal may be granted, notwithstanding the statutory language to the contrary. The creation of such a category also runs directly counter to past cases decided by this court.

Relying on *Paladino v. State,* a 1925 case, *State v. Hintz,* a 1930 case, and *Maahs v. Schultz,* a 1932 case, the dissent concludes that, when the circumstances of a case "raise doubt about the proceedings sufficient in

the court's view to justify a trial before a new jury" (*Infra*, p. 754, Abrahamson, J., dissenting), the reviewing court does not have to find a substantial probability of a different result at the new trial. However, all three of these cases specifically based their reversal on the court's conclusion that justice had miscarried. *See Paladino v. State,* 187 Wis. 605, 606, 205 N.W. 320 (1925); *State v. Hintz,* 200 Wis. 636, 642, 229 N.W. 54 (1930); *Maahs v. Schultz,* 207 Wis. 624, 638, 242 N.W. 195 (1932). The dissent also fails to note that *Lock v. State,* 31 Wis. 2d 110, 142 N.W.2d 183 (1966), a case decided in 1966 and relied upon by this court since that time, unequivocally established the rule to be followed for determining when a miscarriage of justice has occurred: There must be a finding of a substantial probability that a new trial would produce a different result. *Id.* at 118.

I am authorized to state that JUSTICES ROLAND B. DAY, DONALD W. STEINMETZ, LOUIS J. CECI, and WILLIAM A. BABLITCH join in this concurring opinion.

SHIRLEY S. ABRAHAMSON, J. (dissenting). The court of appeals reversed the judgment of conviction in the interest of justice, exercising its discretion pursuant to sec. 752.35, Stats. 1983–84.[1] I would affirm the decision of the court of appeals.

_____

[1] Sec. 752.35, Stats. 1983–84, provides as follows:

"**752.35 Discretionary reversal.** In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes 'or rules, as are necessary to accomplish the ends of justice."

Violating the precepts of *State v. McConnohie,* 113 Wis. 2d 362, 334 N.W.2d 903 (1983), the majority substitutes its view of the interest of justice in the present case for that of the court of appeals. The majority reaches the result it desires by a strained reading of our prior cases and of the decision of the court of appeals and by a declaration that the court of appeals improperly interpreted our cases and committed an error of law.

Sec. 752.35 applies to the court of appeals, and sec. 751.06 applies to this court.[2] They use the same language and they are often referred to as the statutes authorizing "reversal in the interest of justice," although the phrase "interest of justice" does not appear in the language. Thus the court of appeals and the majority properly turn to cases interpreting this court's practice and powers under sec. 751.06 as applicable in interpreting the court of appeals' practice and powers under sec. 752.35.

This court has often expressed its reluctance to grant a new trial in the interest of justice and has stated that it exercises its discretionary power only in exceptional cases. *State v. Cuyler,* 110 Wis. 2d 133, 141, 327 N.W.2d 662 (1983). Sec. 752.35, like sec. 751.06, appears to establish two categories under which a reviewing court

---

[2] Sec. 751.06, Stats. 1983–84, provides as follows:

"**751.06 Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

Sec. 751.06 is substantially the same as sec. 2405m, Stats. 1913.

may order a new trial: (1) whenever the real controversy has not been fully tried; and (2) whenever it is probable that justice for any reason has miscarried. Our cases have established within the statutory framework three classes of cases in which a reviewing court may order a new trial.

(1) The first class of cases falls squarely in the statutory "fully tried" category: There may be a discretionary reversal whenever the real controversy has not been fully tried. The real controversy is not fully tried generally because the fact finder did not hear all the relevant evidence. When a case falls within this class, the court may reverse even though the court can not conclude that a probability exists that the defendant would not be found guilty in a new trial. *State v. Cuyler,* 110 Wis. 2d 133, 142, 327 N.W.2d 662 (1983) (evidence erroneously excluded); *Logan v. State,* 43 Wis. 2d 128, 137, 168 N.W.2d 171 (1969) (counsel's failure to place highly relevant testimony into evidence).

(2) The second class of cases falls squarely within the statutory miscarriage of justice category: There may be a discretionary reversal whenever it is probable that justice for any reason has miscarried. For such a probability to exist in this class of cases, it must appear that the defendant would be found not guilty in a new trial and that justice demands the defendant be given another trial. In other words, "a new trial in the interest of justice will be granted only if there has been an apparent miscarriage of justice and it appears that a retrial under optimum circumstances will produce a different result." *Jones v. State,* 70 Wis. 2d 41, 56, 233 N.W.2d 430 (1975). *See also State v. Ruiz,* 118 Wis. 2d 177, 200, 347 N.W.2d 352 (1984); *Haskins v. State,* 97 Wis. 2d 408, 425, 294 N.W.2d 25 (1980); *Frankovis v. State,* 94 Wis. 2d 141, 152, 287 N.W.2d 791 (1980); *Rogers v. State,* 93 Wis. 2d 682, 694, 287

N.W.2d 774 (1980); *Boyer v. State*, 91 Wis. 2d 647, 674, 284 N.W.2d 30 (1979); *Hoppe v. State*, 74 Wis. 2d 107, 122, 246 N.W.2d 122 (1976); *Lock v. State*, 31 Wis. 2d 110, 118, 142 N.W.2d 183 (1966).

(3) A third class of cases sometimes discusses discretionary reversal in "miscarriage of justice" language and other times in "real controversy not fully tried" language, and other times uses the statutory language of both categories as well as the phrase "in the interest of justice." In cases falling in this class, the circumstances of the case justify the court's exercising its discretionary power to reverse even when the court cannot conclude that the outcome would be different on a retrial.[3]

There are numerous cases in which the court reversed "in the interest of justice" or on the basis of "miscarriage of justice" without concluding that a new trial

[3] The state acknowledges in its brief and in oral argument in this case and in its brief in State v. D'Acquisto, 124 Wis. 2d 758, 370 N.W.2d 781 (1985) (see n. 1 of the brief) that there is a class of cases—albeit small, limited, and unusual—in which the court may reverse a conviction when the court's reading of the record convinces the court, for whatever reason, that in the interest of justice another jury ought to hear the case. The state urges, however, that the court apply the *Strickland v. Washington* "prejudicial error" test to reversals in this class of cases. State's brief in this case at p. 20. The *Strickland v. Washington* test is not an outcome-determinative test as the majority appears to adopt here. *Strickland v. Washington* would require only that there be a reasonable probability that the result would be different without the alleged error, with reasonable probability defined as "a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, — U.S. —, 109 S. Ct 2052, 2068 (1984). A probability sufficient to undermine confidence in the outcome does not seem to be the same, however, as the majority's requirement that the court state that "there is a substantial degree of probability that a new trial would produce a different result." *See also State v. Dyess*, 124 Wis. 2d 525, 370 N.W.2d 222 (1985); *State v. Pitsch*, 124 Wis. 2d 628, 369 N.W.2d 711 (1985); *State v. Ludwig*, 124 Wis. 2d 600, 369 N.W.2d 722 (1985).

would produce a different result;[4] but the key case illustrative of this class of cases is *Lorenz v. Wolff*, 45 Wis. 2d 407, 173 N.W.2d 129 (1970). The *Lorenz* court said that "for the determination of whether justice has miscarried" the court "is not necessarily confined" to the "mechanistic formula" that the result of the second trial will be different. *Lorenz, supra,* 45 Wis. 2d at 414. In *Lorenz,* in which evidence and statements of counsel were erroneously admitted (in contrast to class 1 cases where evidence was erroneously excluded), the court was concerned that "the evidence may not have been *fairly* weighed." *Id.* at 415. Upon review of the record, the *Lorenz* court concluded that as a result of the erroneously admitted evidence and statements of counsel, the defendant did not get a "fair trial," *id.* at 425, and that "there was a probable miscarriage of justice," *id.* at 426. The *Lorenz* court never spoke in terms of the real controversy not having been fully tried. The conviction was reversed "in the interest of justice," *id.* at 426, even though the court could not "say, using the mechanistic rule . . . , that on a retrial the plaintiff would probably win." *Id.* at 415.

In *Air Wisconsin, Inc. v. North Central Airlines, Inc.,* 98 Wis. 2d 301, 296 N.W.2d 749 (1980), the court concluded that the defendant did not get "a full, fair trial of the issues of the case," *id.* at 318, when an erroneous instruction was given on a significant issue, and "that there was a probable miscarriage of justice because the issue of liability had not been fully or properly tried." *Id.* The court would not declare that it believed the outcome would be different on retrial. *Id. See also*

---

[4] *See, e.g., Paladino v. State,* 187 Wis. 605, 205 N.W. 320 (1925); *Koss v. A. Geo. Schulz Co.,* 195 Wis. 243, 218 N.W. 175 (1928); *State v. Hintz,* 200 Wis. 636, 229 N.W. 54 (1930); *Jacobsen v. State,* 205 Wis. 304, 237 N.W. 142 (1931); *Volk v. Flatz,* 206 Wis. 270, 239 N.W. 424 (1931); *Maahs v. Schultz,* 207 Wis. 624, 242 N.W. 195 (1932).

*In the Interest of C.E.W.*, 124 Wis. 2d 47, 368 N.W. 2d 47 (1985).

While these cases are civil cases, I agree with the state's position in oral argument that *"Lorenz* and what *Lorenz* has to say about discretionary reversal is fully applicable to criminal cases." I agree with the state's position at oral argument that if there is a difference in the application of secs. 751.06 and 752.35 to civil and criminal cases, the court, because of the liberty interests involved in a criminal case, should be more willing to reverse a criminal than a civil case in the interest of justice.

These three classes of cases reflect the objectives of our criminal justice system: only the guilty shall be convicted and only by a fair trial in which guilt is demonstrated beyond a reasonable doubt.

The majority opinion apparently retains the three classes of cases but places the "non-mechanistic formula" (what I call class 3 cases) only within the first statutory category, *i.e.*, that "the real controversy has not been fully tried." In its discussion of the *Lorenz* case the majority ignores the *Lorenz* court's reference to miscarriage of justice and equates the words "fairly tried," which are used in *Lorenz,* with the statutory words "fully tried." Thus the majority states that the *Lorenz* court "concluded that the real controversy was not *fully tried* because 'the circumstances of the trial prevented a *fair trial* of the factual issues of the case.' " Page 738. (Emphasis added.) The majority concludes that, if a case has not been "fairly tried," the appellate court need not state its belief that there is "a substantial degree of probability that a new trial would produce a different result" (at p. 734) but may reverse the conviction—if and only if the court says that the unfairness involved resulted in the case not having been "fully tried."

The majority's test that the court must conclude that "there is a substantial degree of probability that a new trial would produce a different result" is set forth without any citation to authority. Through a Lexis search I could find only two Wisconsin Supreme Court cases using this test. *See State v. Boyce,* 75 Wis. 2d 452, 463, 249 N.W.2d 758 (1977), and *Roe v. State,* 95 Wis. 2d 226, 243, 290 N.W.2d 291 (1980) (quoting *Boyce*). Although the language in our cases has some variation, the other cases speak of a probability that a new trial would produce a different result, not substantial degree of probability.

The court of appeals obviously concluded, although it never used these terms, that in its opinion the defects in the trial rendered the trial fundamentally unfair. The court of appeals inferred from the jury foreman's misbehavior an "attitude . . . inconsistent with his [the juror's] duties" (Ct. App. slip opinion at page 30). This concern, combined with "the closeness of the case," undermined the court of appeals' confidence in the trial.

The majority concludes that the court of appeals, in exercising its discretion to reverse the conviction, committed an error of law. According to the reasoning of the majority opinion, the court of appeals erred as follows: the court of appeals concluded that "the record contains no suggestion that the real controversy has not been fully tried" (Ct. App. slip opinion, page 26) but rather that there had been a miscarriage of justice; the court of appeals did not state a belief regarding "a substantial degree of probability that a new trial would produce a different result"; reversal under the statutory miscarriage of justice category—unlike reversal under the statutory fully tried category—requires, according to the majority opinion, that the court state a belief that there is "a substantial degree of probability that a new trial would produce a different result";

therefore, says the majority, the court of appeals erred as a matter of law in reversing the conviction when it concluded that there was a miscarriage of justice but not that there was "a substantial degree of probability that a new trial would produce a different result." Put another way, according to the majority, the court of appeals made an error of law when it reversed the conviction, explained its decision to reverse in terms of a miscarriage of justice rather than in terms of a failure to fully try the real controversy, and then failed to state a belief regarding the substantial degree of probability as to the outcome of a new trial.

As I see it, the majority is engaging in a semantic shell game. According to the majority's analysis, had the court of appeals put its discussion under the "real controversy not fully tried" shell, instead of under the "miscarriage of justice" shell, there would have been no error of law, and this court would not have reviewed the court of appeals' exercise of discretion. To avoid the result here, the court of appeals should have said: no relevant evidence was erroneously excluded; no relevant evidence was erroneously admitted; no erroneous instructions were given; the record thus contains no suggestion that the real controversy has not been fully tried; circumstances outside the trial record and the closeness of the case show, however, that the case may not have been fairly tried, and therefore the real controversy was not fully tried. It was omission of this last statement that results in the majority's declaration of error of law.

I do not think it can be said the court of appeals committed an error of law because it treated the "not fairly tried" ground for discretionary reversal (the class 3 case) as a subcategory of "miscarriage of justice" or as a separate, independent category rather than

as a subcategory of "the real controversy was not fully tried."

I can find no error of law in the court of appeals' discussion of discretionary reversal, and I would not review its discretionary determination. I might reach a different result were I to exercise my own discretion, but that is not the issue. As this court said in *State v. McConnohie,* 113 Wis. 2d 362, 368, 334 N.W.2d 903 (1983), "there is no assumption by this court that its determinations are necessarily more just than those of a court of appeals."

I would hold that the court of appeals applied the correct law when it exercised its discretion to reverse a conviction after it concluded "that justice probably has miscarried and [it] should order a new trial." Ct. App., slip opinion at page 28.

The court of appeals concluded that although the errors would not justify a reversal and the evidence was sufficient to support a conviction, the presence of a juror whose "attitude was inconsistent with his duties" (Ct. App. slip opinion at page 30) and the closeness of the case justified a new trial. The court of appeals' reasoning in reversing the conviction is similar to the reasoning this court has used in several cases. This court has previously concluded that the court's uneasiness with the way a case was tried plus the closeness of the evidence justified a new trial. In *Paladino v. State,* 187 Wis. 605, 606, 205 N.W. 320 (1925), where numerous evidentiary errors were alleged, this court said:

"While there appear to be no errors sufficient to work a reversal of the judgment, the court is of the opinion that a new trial should be ordered in this case for the reason that it appears probable that justice has miscarried. Sec. 2405*m,* Stats. It is not held that there is not sufficient evidence to sustain a verdict. But upon the whole record this court is of the opinion that in the

interests and in furtherance of justice there should be a new trial, and in view of that fact we purposely refrain from any comment upon the evidence. While the errors complained of are not sufficient to work a reversal under the rule, this being a very close and doubtful case, we are of the opinion that the defendant should have an opportunity of presenting the matter to another jury."

In *State v. Hintz*, 200 Wis. 636, 642, 229 N.W. 54 (1930), this court, citing *Paladino*, expressed doubts about the case because of the closeness of the case. The *Hintz* court did not expressly state a belief regarding a result.[5]

---

[5] In *State v. Hintz*, 200 Wis. 636, 641–42, 229 N.W.2d 54 (1930), the court wrote: "Manifestly the situation presents an ordinary conflict of evidence, the weight of which is for the determination of the jury. The power of the court to disturb the finding of the jury ends with the discovery of evidence to sustain the verdict. In the interest of exactness it should perhaps be stated that this rule is subject to two qualifications: one is where the finding of the jury is contrary to established physical facts, and the other is where it is contrary to all of the reasonable probabilities. There is no room here, however, for the operation of either of these qualifications. There are no physical facts involved, and the reasonable probabilities depend upon the inferences to be drawn from the established facts in the case. . . . No rule is more thoroughly established by the decisions of this court than that where conflicting inferences may be drawn from the facts probed the question is one for the jury. . . . Viewing the case from any angle, and in the light of all established principles, the question of defendant's intent presented a plain jury question. Whatever doubts we may entertain concerning the justice of this verdict, our power to disturb it is limited by established rules of jurisprudence designed to protect the sanctity of findings of fact, a function which constituted society has committed to the jury.

"As we contemplate this conclusion, we cannot escape the reflection that at times one's liberties are shielded by a curtain of the merest gauze. This evidence leaves the question of defendant's intent to defraud in the greatest doubt. While it is the function of the jury to resolve this doubt, it seems probable to us that justice has miscarried by the verdict rendered. Under such cir-

The court of appeals relied on *Maahs v. Schultz*, 207 Wis. 624, 638, 242 N.W. 195 (1932), which in turn cited *Paladino* and *Hintz*, as authority for reversing in the interest of justice. In the *Maahs* case, a juror did not reveal his relationship with a party or his knowledge of the case. Although the court recognized that had the juror revealed the information he would not have been disqualified for cause, the court still had grave doubts whether a verdict subject to the juror's influence should be permitted to stand. The court said that "there is nothing so essential in the administration of justice as the avoidance of seeming partiality." *Id.* at 637. Because the *Maahs* court concluded that the circumstances raised a serious question as to the impartiality of the juror and therefore the "justice of the verdict," the *Maahs* court exercised its discretion to reverse the judgment.

The majority opinion is unpersuasive in its attempt to distinguish *Paladino, Hintz* and *Maahs* from the case at bar. The majority declares that those courts' "determination was the functional equivalent of stating trial would produce a different result." Page 740. I disagree. The court in each case was simply saying, as the court of appeals says in this case, that the circumstances of the case raise doubt about the proceedings sufficient in the court's view to justify a trial before a new jury.

Because I would affirm the discretionary reversal, I need not reach the other issues decided by the majority opinion.[6] Nevertheless, I comment on the jury *voir*

cumstances it is within our power to order a new trial. Sec. 251.09, Stats.; *Paladino v. State*, 187 Wis. 605, 205 N.W. 320. Because we think the question of defendant's guilt should be passed upon by another jury, the . . . [j]udgment [is] reversed."

[6] This case and *State v. D'Acquisto*, 124 Wis. 2d 758, 370 N.W. 2d 281 (1985), of even date, lead me to question the wisdom of

*dire* issue because of its importance in the law. Even were I to join the majority mandate, I would not join its opinion on the *voir dire* issue.

This court's emphasis on the lawyer's responsibility to conduct a full and adequate *voir dire* to protect the client is well established. See *After Hour Welding Inc. v. Laneil Management Co.*, 108 Wis. 2d 734, 744, 324 N.W.2d 686 (1982); *State v. Shilcutt*, 119 Wis. 2d 788, 812, 350 N.W.2d 686 (1984) (Heffernan, C.J. concurring). Yet, as the present case illustrates, *voir dire* may become a relatively useless exercise unless the court affords a party an adequate remedy when a juror misstates material information or fails to make full disclosure of material information.

Unfortunately, the majority opinion does not clearly articulate its test for determining when a new trial should be ordered if a juror misstates material information or fails to make full disclosure. The majority opin-

*State v. McConnohie*, 113 Wis. 2d 362, 334 N.W.2d 903 (1983). Perhaps it would be more consistent with this court's supervisory power and with principles of appellate review if, when we grant review of a court of appeals' decision as we did in this case, we would not review the court of appeals' discretionary reversal. Perhaps we should do what the majority of the court ultimately does here, that is, this court exercises its own discretion regarding reversal.

Deference to the court of appeals' discretionary reversal, unlike deference to the circuit court's discretionary reversal, is not warranted because the court of appeals has no more information than this court to determine whether a new trial should be granted. The court of appeals reads the same record as this court and— like this court—has not observed the trial and the witnesses. Consequently, we should treat the court of appeals' discretionary reversal decision as we generally treat rulings of the circuit court in which this court and the circuit court examine the same written materials and have the same expertise to rule on the issue. In such cases this court makes the decision *ab initio* without deference to the circuit court.

ion rejects the test set forth by the United States Supreme Court in *McDonough Power Co., Inc. v. Greenwood*, 464 U.S. 548, 104 S. Ct. 845 (1984).[7] Pages 727–730. The majority then states its own test somewhat differently in different parts of the opinion. At one point, the majority opinion states that the "rule is that in order to be awarded a new trial, a litigant must demonstrate: (1) that the juror incorrectly or incompletely responded to a material question on *voir dire;* and if so, (2) that it is more probable than not that under the facts and circumstances surrounding the particular case, the juror was biased against the moving party." Page 726. This apparently is the test the majority applies. At another point in the opinion, however, the majority says that "the proper focus of inquiry . . . is whether the juror was biased and whether the litigant was prejudiced as a result." Page 725. The majority also says that the test of bias is whether it is more probable than not that the juror was biased against the litigant. Pages 730–731. The word "biased" is not defined. The majority opinion refuses to limit "bias" to a statutory or common law "challenge for cause" test,[8] p. 728, or to expand "bias" to "a peremptory

[7] *McDonough Power Co., Inc. v. Greenwood*, —— U.S. ——, 104 S. Ct. 845 (1984), is a case which originated in federal district court. It is not entirely clear whether the Supreme Court's holding is a matter of federal procedure or federal constitutional law. This court's majority opinion does not state whether its test is an interpretation of a state statute, the state constitution, or the federal Constitution.

[8] Sec. 805.08(1), Stats. 1983–84, relating to challenge for cause provides as follows:

"805.08 Jurors. (1) QUALIFICATIONS, EXAMINATION. The court shall examine on oath each person who is called as a juror to discover whether the juror is related by blood or marriage to any party or to any attorney appearing in the case, or has any financial interest in the case, or has expressed or formed any opinion,

challenge" test, page 723 (*i.e.*, a test of whether a party was deprived of the effective exercise of the peremptory challenge).

The varying statements of the test and the majority's application of its test raise several questions. If juror bias is found, is prejudice to the litigant assumed? On what basis does the majority conclude that the questions, which the juror in this case incorrectly and incompletely answered, were *material?* Page 731. Since the juror here failed to answer *material* questions correctly (p. 731), why is prejudice to the litigant not presumed? Inasmuch as the court for the first time sets out factors to be considered by the circuit court in determining whether a juror is biased (page 731), why is this court affirming the circuit court's exercise of discretion here rather than remanding the matter for the circuit court's consideration of these factors? How will this court review a circuit court's application of the test? The majority apparently applies the "clearly erroneous" standard to the circuit court's determination of whether the juror was prejudiced (biased), page 732, as if prejudice (bias) is a fact question, and also talks about abuse of discretion in terms of the circuit court's decision to deny the motion for retrial.

Because the majority's discussion leaves open too many questions, I cannot join the majority on the voir dire issue. Because I conclude that the court of appeals

or is aware of any bias or prejudice in the case. If a juror is not indifferent in the case, the juror shall be excused. Any party objecting for cause to a juror may introduce evidence in support of the objection. This section shall not be construed as abridging in any manner the right of either party to supplement the court's examination of any person as to qualifications, but such examination shall not be repetitious or based upon hypothetical questions."

did not commit an error of law, thereby abusing its discretion, I would affirm the decision of the court of appeals.

